**Lisa Joyce RUBIN Petitioner**

v.

**Archie GEE, Director, et al. Respondents**

**No. CIV. PJM 99–621.**

United States District Court, D. Maryland.

Feb. 7, 2001.

Fred Warren Bennett, Bennett & Nathans, LLP, Greenbelt, MD, for Lisa Joyce Rubin.

Gary E. Bair, Office of the Atty. Gen. of Maryland, Baltimore, MD, J. Joseph Curran, Jr., Office of the Atty. Gen., Baltimore, MD, for Archie Gee, J. Joseph Curran.

## OPINION

MESSITTE, District Judge.

### I.

On November 11, 1990, a jury in the Circuit Court for Montgomery County, Maryland, convicted Lisa Joyce Rubin of the crimes of first degree murder and the use of a handgun in a crime of violence. She was sentenced to life in prison, all suspended except for 30 years on the murder charge and 20 years on the handgun charge, the sentences to run concurrently.

Rubin appealed to the Maryland Court of Special Appeals, but before that court could consider the case, the Maryland Court of Appeals granted *certiorari* and affirmed her convictions. *See Rubin v. State*, 325 Md. 552, 602 A.2d 677 (1992).

On September 29, 1995, Rubin filed a petition for post-conviction relief in the Circuit Court for Montgomery County. Following an evidentiary hearing, the post-conviction court (James L. Ryan, Judge) granted the petition and ordered a new trial. The State of Maryland then filed an application for leave to appeal to the Court of Special Appeals. On November 6, 1997, without the benefit of a transcript of the post-conviction hearing (which the State had not ordered) and apparently without the benefit of full briefing, the Court of Special Appeals, in an unpublished opinion, summarily reversed the Circuit Court's order granting a new trial. When Rubin filed motions for leave to supplement the record and for reconsideration, the Court of Special Appeals recalled its opinion but soon after, in a second unpublished opinion dated July 28, 1998, again reversed the decision of the Circuit Court. Rubin's application for *certiorari* to the Maryland Court of Appeals was denied. *See Rubin v. State*, 351 Md. 663, 719 A.2d 1262 (1998).

The present petition for habeas corpus relief followed.

Rubin argues in this Court that the decision of the Court of Special Appeals was constitutionally infirm as a matter of law and fact in that it improperly denied her claim of ineffective assistance of counsel based on her attorneys' conflict of interest. The Court agrees.

### II.

A) There is no question that on April 24, 1990, Rubin shot and killed her husband,

Timothy Warner. Rubin claimed that she acted in self-defense.

At the time, she and her husband were beginning divorce proceedings. According to Rubin—who was the only witness called by the defense at trial—certain critical facts pertaining to the couple's relationship led up to the homicide. During her marriage, Rubin had had an affair with a William Glisson, at the end of which Glisson physically assaulted her, injuring her wrist. Rubin and Warner subsequently brought a civil action against Glisson which went to trial in January 1989. During that trial, Glisson was poisoned when he drank out of a Coca-Cola bottle that lab tests revealed contained a cyanide substance. No one was ever charged in connection with that incident.

Following the trial against Glisson, Rubin and Warner separated. Rubin hired Prudential Associates, a private investigation company, to pursue the possibility that Warner might be having an affair. Robert Miller, President of Prudential, and Robert Leopold, an investigator at the company, worked on Rubin's case and soon determined that Warner was indeed having a liaison.

In April, 1990, the Glisson case resurfaced. In that month, Rubin told Miller that Warner had told her in January 1990 that it was he who had poisoned Glisson, revealing to her some of the details of his actions. Rubin, who was frightened (of Warner,[1] wanted to inform the authorities of what she knew. In consequence, Miller referred Rubin to Darrel Longest, Esquire, a private attorney and formerly Deputy State's Attorney for Montgomery County, who she hoped would arrange for her to meet with the authorities, disclose what she knew about the poisoning, and

obtain immunity for her. Rubin quickly retained Longest, who immediately hired Miller to work as his investigator in the case. By April 10, Longest had arranged with Matthew Campbell, Deputy State's Attorney for Montgomery County, for Rubin to receive immunity in the Glisson matter. On April 20, Longest and Rubin had a meeting with Montgomery County Detective Charles Shawen at Longest's office, during which Rubin told Shawen what Warner had confessed to her about the poisoning.

In the late afternoon or early evening of April 24, 1990—four days after she had met with Detective Shawen—Rubin met with Warner at a veterinary clinic in Gaithersburg in order to have the couple's dog Mutley put to sleep. Rubin testified that at the meeting, during a walk with Warner and the dog in the woods behind the clinic, she brought up the fact that Warner had admitted that it was he who had poisoned Glisson.[2] Rubin testified that Warner told her she had better not tell anyone about that, but Rubin said it was too late, that she had already gone to the authorities. According to Rubin, Warner became enraged and pulled out what Rubin believed to be a gun. She therefore took her Smith and Wesson handgun from her purse and shot him. She testified that because he kept coming at her, she shot him again—a total of 8 shots, 3 in his chest or arms and 5 more in the back, including a reloading.

Rubin then went back to the veterinary clinic where she called Miller in an effort, she testified, to reach Longest. Reaching Miller, she arranged to meet him at a neutral point from which the two of them, together with Leopold, returned to the

---

1. Rubin testified at trial that, in the course of these events, her fear of her husband had led her to purchase two handguns, a .38 caliber Ladysmith model Smith and Wesson and a .22 caliber Beretta. One of these, she said, she intended to carry on her person, the other she would keep at her home. *See Rubin,* 325 Md. at 557–59, 602 A.2d at 679–80.

2. "Rubin's version of the events is that she had hoped to record at the meeting Warner's admissions of attempted murder." *Rubin,* 325 Md. at 561, 602 A.2d at 681. Following the homicide, a minicassette recorder and two minicassette tapes were found in Rubin's purse. *See id.* at 683.

scene of the crime. In short order, but before the police were contacted, Longest and Gavin were called and arrived on the scene.

The Court of Special Appeals, in its opinion of July 28, 1998, accepted without dispute the following additional facts found by the post-conviction hearing judge pertaining to the night of the homicide:

> Petitioner [Rubin] had apparently taken a large amount of medication, and Longest told Miller and Leopold to take her to the hospital for a possible drug overdose and have her admitted under a false name. Miller and Leopold transported Petitioner to Montgomery General Hospital and checked her in under the name Sharon Peterson. [Judge Rodowsky in his Opinion for the Court of Appeals stated that Mrs. (sic) Rubin was "registered" at the hospital but was not admitted for treatment.] Petitioner was discharged at 3:00 a.m. on April 25 and spent the remainder of the night at Miller's house. While petitioner was at the hospital, Longest notified the police that Warner was dead, but did not disclose petitioner's identity, and the crime scene was then processed.
>
> Petitioner spent the rest of April 25 with Longest and Gavin. Gavin drove Petitioner to her bank to withdraw $105,000 to be used as a retainer fee and to cover expenses. In addition, Longest took possession of some of her property, which included a jacket, a purse, .22 caliber bullets and a .38 caliber Smith and Wesson handgun. These items were kept at the law offices of Longest and Gavin. After discussions with the Office of the State's Attorney, during which it was discovered there was a warrant out for petitioner's arrest, petitioner was turned in to the police that evening at 7:00 p.m.

*State v. Rubin,* No. 38, September Term, 1997, slip op. at 3–4 (Md.Ct.Spec.App. July 28, 1998).

Except for testifying that she went to the hospital following the homicide, none of the facts set out in the foregoing two paragraphs of the Court of Special Appeals' opinion were brought out during Rubin's direct trial testimony. It was left for the prosecution—with careful pruning of any reference to Longest and Gavin's role—to bring out the more salient points on cross-examination:

> Q. You went to the hospital and said that you attempted to commit suicide because of a drug overdose. Is that right? ...
>
> The Witness. I didn't check myself in. I don't know what they said.
>
> Q. Well, when you went there, what was the purpose of your visit?
>
> A. They decided to take me there.
>
> Q. They decided to take you there. Didn't you relay information to the private investigators that you had tried to overdose after the fact and that you tried to kill yourself?
>
> A. No.
>
> Q. No? When you went there, wasn't the name Sharon Peterson initially given to the hospital?
>
> A. Not by me.
>
> Q. The private investigators gave the name Sharon Peterson?
>
> A. I don't know who gave the name
>
> ...
>
> Q. It is only after the private investigators and everyone starts calling you Lisa and the hospital staff said "Why is she going by Lisa," that then you correct the record and give your proper name as Lisa Rubin. Is that right?
>
> A. I couldn't have corrected a record that I didn't know wasn't correct in the first place.
>
> *  *  *  *  *  *
>
> Q. When you turned yourself in, the police had an arrest warrant for you, did they not?
>
> A. Yes.
>
> *  *  *  *  *  *

Q. Was Mr. Longest aware of the fact that you spent the night at Mr. and Mrs. Miller's?

A. Yes.

\* \* \* \* \* \*

Longest and Gavin did not serve as Rubin's trial counsel. On their recommendation, Rubin had engaged Barry Helfand in this capacity and Helfand in turn engaged Alan Goldstein to assist him.[3] Nevertheless, though neither sat at counsel table during the trial, Longest and Gavin at all times remained as co-counsel up to and throughout the trial.[4] Neither Longest nor Gavin was called at trial to testify as to their role in directing the actions that Rubin took following the homicide.

In his closing, however, the prosecutor referred to those actions:

[Rubin] ends up spending that night with [Mr. Miller] and she meets with him and brings him back to the scene and then after the lawyers get involved she goes into the hospital and checked in under a fake name, Sharon Peterson, and then spends the night at Mr. Miller's house.

Only after the police get a warrant and they put the case together and she is notified of that warrant, then she turns herself in at the police station. Does she flee from this scene? You bet. Does she lie? You bet. Does she show consciousness of guilt? In other words,

"I am an innocent man. Let's go to the police. I will explain what happened." Never. Never.

The jury's verdict of guilty on the first-degree murder and handgun charges followed shortly after.

### III.

The core defense strategy in the case, as suggested by the Maryland Court of Appeals on direct appeal, was that Longest and Gavin had an attorney-client relationship with Rubin such that Leopold, as an agent of Longest and Gavin, should have been prohibited by the privilege from testifying when called as a cooperating witness by the State. See Rubin, 602 A.2d 677. The Court of Appeals agreed with that proposition but a majority of the court (over a vigorous dissent by then Associate, now Chief Judge, Bell) held that even without Leopold's testimony it could not be said that reasonable doubt existed as to Rubin's guilt. The convictions were thus affirmed.

In the course of its opinion, the court touched upon the legal and ethical correctness of Longest and Gavin's removal, possible alteration and retention of evidence. Indeed, the State had argued that because of Longest and Gavin's actions in removing the evidence, the crime-fraud exception to the attorney-client privilege was brought into play and as a result Leopold was correctly permitted to testify.[5] The court,

---

3. Rubin subsequently hired Fred Joseph to serve as additional co-counsel.

4. The nature and extent of Longest and Gavin's role as co-counsel will be discussed in the course of this Opinion.

5. The State's brief on appeal included this paragraph:

The crime-fraud exception applies to defeat the client's privilege even "where the pertinent alleged criminality is solely that of the law firm." In re Impounded Case (Law Firm), 879 F.2d 1211, 1213 (3rd Cir.1989). In deciding whether the exception applies there must be a prima facie showing of criminal and fraudulent conduct ... no doubt this exception applies in the instant

case given the conduct of Rubin and her attorneys Longest and Gavin.

After killing her husband, Rubin called investigators Miller and Leopold and directed them to the crime scene. They altered the crime scene by unleashing the dog Muttley (sic) from Warner's dead body (E .289–90). After Longest arrived, he directed the investigators to take Rubin away from the murder situs, to check her into a hospital using a false name, and not to tell anyone what had happened (E.17, 512). Longest took possession of the murder weapon, Rubin's purse and the .22 caliber bullets contained therein, placing them in his law office (E.339–41, 345–46). This evidence too was altered, in that the bag of bullets was removed from Rubin's purse where they earli-

as indicated, disagreed, holding that the privilege applied but that permitting Leopold's testimony was harmless error.

At no point, however, did the court consider the propriety of Longest and Gavin's actions from the standpoint of ineffective assistance of counsel.[6] That issue remained, as is usually the case, more appropriate for collateral review. *See Kimmelman v. Morrison,* 477 U.S. 365, 378, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986) ("A layman will ordinarily be unable to recognize counsel's errors and to evaluate counsel's professional performance; consequently a criminal defendant will rarely know that he has not been represented competently until after trial or appeal, usually when he consults another lawyer about his case.") (internal citation omitted).

## IV.

A) At the post-conviction hearing, Assistant Montgomery County State's Attorney Thomas Tamm, who had been called to the scene of the homicide on the night of its occurrence, testified as follows:

Q. Okay. Now did you also confer with members of your office regarding the issue of Longest and Gavin refusing to answer any questions at the scene?

A. Yes, sometime during the day I discussed that.

Q. Was your concern specifically the issue or alleged issue of privilege?

A. Well, I mean, that is one of the issues. I thought they might be witnesses. There were just—there were quite a few numerous legal issues, it seemed to me—potential—that one of

which was whether they could possibly have a privilege, basically an anticipatory privilege for something that they had—you know, they had not been retained on—whether they were witnesses.

I had asked them several questions if they had seen other individuals other their clients up at the scene, trying to get any sort of information that we could use for the investigation.

Q. And what was your concern at that point in time? This being the morning—the day of April 25th about them being witnesses?

A. Well, I mean, then if they are witnesses, there would be a potential conflict of interest whether they could act in both capacities as legal counsel as well as be witnesses. I didn't think they should.

Q. Did you formulate a subject matter for which you thought they may be witnesses to? What particular subjects?

A. I thought they were fact witnesses.

Q. Okay. And potentially would it be fair to say they would potentially be fact witnesses for the State of Maryland?

A. Sure.

\* \* \* \* \* \*

Q. And would you tell us please who Mr. Leopold indicated provided the directive as to checking Mrs. Rubin into a hospital under a false name?

A. He indicated that Darrel Longest suggested that they—I think it was he

---

er had been seen by Leopold (E.345–46, 299–300).

The above facts make out a *prima facie* case of several crimes. One may be an accessory after the fact to a murder by altering the crime scene, attempting to harbor the accused, and secreting evidence of a crime. *Osborne v. State,* 304 Md. 323, 326, 499 A.2d 170 (1985). Similarly, these acts could constitute the crime of obstruction of justice under Article 27, § 27 of the Maryland Code. *See Romans v. State,* 178 Md. 588, 592, 16 A.2d 642 (1940), *cert. denied,*

312 U.S. 695, 61 S.Ct. 732, 85 L.Ed. 1131 (1941). And, the agreement by two or more persons to do these acts could constitute a criminal conspiracy. *See Monoker v. State,* 321 Md. 214, 221, 582 A.2d 525 (1990).

6. Indeed, there is no indication that the Court of Appeals knew that Longest and Gavin had continued to serve as Rubin's co-counsel through the time of trial.

and Mr. Miller take Ms. Rubin to Montgomery County General, which was not the closest hospital, and that they check her in under a false name.

Q. Okay. At this point in time when you heard this information, did you have concern about possible obstruction of justice on the part of Mr. Longest?

A. Yes. It was just—yes.

\* \* \* \* \* \*

Q. Were there concerns about when Miller and Leopold showed up at the Peachtree Veterinarian Clinic scene that there may have been physical tampering with evidence? [7]

A. That was a concern. There was also a concern as to whether they had removed evidence from the scene.

Q. Okay.

A. Somebody had removed evidence from the scene.

Q. In addition with the prospect of them having removed evidence, were they concerned about the fact that pictures had been taken by Mr. Miller and Mr. Leopold?

A. Well, that was learned after Mr. Leopold was interviewed.

Q. And was that one of the concerns of the detective in the case?

A. Yes.

Q. Were they concerned about Ms. Rubin having been taken to a hospital in an attempt to check her in under a false name?

A. Yes.

Q. Were they concerned about her being physically cleaned up before she was turned in to law enforcement authorities?

A. Yes.

Q. Were they concerned about the clothing having been removed and cleaned before she was turned in to law enforcement authorities?

A. Yes.

\* \* \* \* \* \*

Q. Were they concerned about a weapon that may have been used missing for 24 hours from law enforcement authorities?

\* \* \* \* \* \*

Q. THE WITNESS: I think that there was a valid law enforcement purpose to try and find the weapon that was used.

BY MR. FINDLING:

Q. Were they concerned about the possible destruction of barium and antimony evidence that could have consisted on the person of Lisa Rubin, and or, any clothing or any articles she had on her person because of the 24–hour delay?

A. Yes.

\* \* \* \* \* \*

Q. Regarding all of these concerns that I have gone through with you, were they also concerned that these specific acts of tampering could have been perpetrated by the lawyers who reported to the scene as well—namely, Mr. Longest and Mr. Gavin? (Emphasis supplied)

\* \* \* \* \* \*

A. I think there was a concern shared by the police as well as us—or me.

Q. Okay. Us being—I am sorry?

A. I probably should say me.

\* \* \* \* \* \*

---

7. While not an issue before the Court, Miller's role on the night of the homicide is worth mentioning. The evidence showed that he and his co-investigator Leopold arrived on the scene before Longest and Gavin and that, at a minimum, Leopold unleashed the dog and Miller took a series of photographs. As with Longest and Gavin, Miller was not called as a witness at trial. Detective Daniel Waring testified at the post-conviction hearing that a warrant was actually drawn for Miller's arrest, possibly for obstruction of justice, but was eventually withdrawn.

Q. Did Longest and Gavin contact you and indicate that they wanted to waive a grand jury presentation and instead have an information?

A. Yes.

Q. And they did that on behalf of Ms. Rubin; am I correct?

A. Right.

*    *    *    *    *    *

Q. And a grand jury would involve bringing witnesses to testify; am I correct?

A. Right, under oath.

Q. Okay. And those witnesses under oath would in a general sense be required to talk about the activities of April 24, and for that matter, April 25 of 1990; am I correct?

A. Yes.

*    *    *    *    *    *

Q. Based on your knowledge of the witnesses that you interviewed about the activities of April 24th and April 25 of 1990, would you expect that one or some of those witnesses in their testimony would at any point mention the name of Darrel Longest and David Gavin?

*    *    *    *    *    *

THE WITNESS: Yes, I would think there would certainly be that potential that that could be brought up.

Q. You knew that—and I am not coming down on you with this question. I am just relying on the information that you have. You understood—well it is already in the record regarding the representation of people's activities of one another—and what you learned from Darrel Longest and David Gavin was they did not want a grand jury presentation in this case; am I correct?

*    *    *    *    *    *

THE WITNESS: They called and said that they would waive presentation of a grand jury. Why, I don't know.

*    *    *    *    *    *

Q. Now you began to develop—you had various concerns at that point in time you had—overall before the case left your office and another state's attorney's office took it, you were involved with the potential ethical conduct of Mr. Gavin and Mr. Longest; am I correct?

A. Yes.

Q. You were concerned about not just ethical conduct, but I think the proper way of asking is that is unethical conduct of Mr. Gavin and Mr. Longest?

A. Concerned—I was concerned whether there was potential criminal charges, potential conflicts of interest

*    *    *    *    *    *

Q. Now didn't you also have concerns that Longest and Gavin may know something about the location of the second gun in the case? Specifically the one that was found underneath Mr. Warner's body?

*    *    *    *    *    *

THE WITNESS: That they may have some knowledge about that gun?

BY MR. FINDLING:

Q. How that gun got underneath Mr. Warner's body?

A. Yes.

*    *    *    *    *    *

Q. You had information through sources, but specifically Mr. Leopold, that Darrel Longest may have obstructed justice; am I correct?

A. I thought it was something that had to be looked at.

Q. Okay. One of the specific things was that on his leadership there was an attempt to keep or put Ms. Rubin in a hospital under a false name; am I correct?

A. Yes.

Q. This leadership role that he took had you to believe that Mr. Longest may have had some type of criminal involvement in this case; am I correct?

A. Again, I thought it was something that needed to be investigated further.

Q. As well as all of the other forensic and evidentiary concerns that you went over during direct examination, you were concerned with Mr. Longest's potential criminal activity on that evening?

A. Right.

\* \* \* \* \* \*

Q. And when you indicated that you had a concern about Darrel Longest's representation, as a prosecutor, you had a concern about defense attorneys having conflicts in cases; am I right?

A. Well, it can potentially impact on the prosecution.

\* \* \* \* \* \*

Q. You also have concern about the potential reversal of a case down the road?

A. Sure.

\* \* \* \* \* \*

B) Also introduced at the post-conviction hearing was a 20–page letter that Longest and Gavin wrote to the Maryland Attorney Grievance Commission in February, 1991—some 3 months after the Rubin trial ended—in defense of the $150,000 fee they eventually took for their representation, after Rubin sought its return. The following are excerpts from the letter:[8]

It is obvious that Barry Helfand knew his retainer was going to include Alan Goldstein, Longest and Gavin and himself, or else it would not have come to us without a dollar figure included. It is also apparent that we [Longest and Gavin] were to continue as counsel to her and go see her in jail because the Re-

tainer Agreement was given to *us* to have signed and fill in the blanks.

\* \* \* \* \* \*

The true point in fact is that Ms. Rubin, at first, *did not want* Mr. Helfand to represent her, but wanted Longest and Gavin to do so.

\* \* \* \* \* \*

● . . . in the week of the trial the client came to *our* offices (Longest and Gavin) and, in the presence of several witnesses, said she was being told by her attorney, Fred Joseph . . . that her only chance for a reduced verdict was to say she recalled shooting her husband, and all the details about *how* she did so . . . This is very strong evidence that she continued to seek out the legal advice of Longest and Gavin through the last day of trial. (Emphasis supplied)

Point in fact was that it was Mr. Gavin and Mr. Longest who convinced Lisa Rubin to agree to her representation by Helfand (and Goldstein) and it was clearly conditioned by her on the fact that Longest and Gavin be part of the defense team from start to finish. (Emphasis supplied)

\* \* \* \* \* \*

Mr. Pavsner asserts that "We are aware that Longest & Gavin spent a considerable amount of time with Ms. Rubin and on her behalf."

In fact, that statement is a significant understatement. Up until the trial began, we spent *by far* the most time with Lisa in trial preparation, in investigation in the field, in consultation with Mr. Roby, (the private investigator) and in talking to psychologists and psychiatrists who were evaluating her, in legal research, and in keeping her relationship with Parole and Probation good, as a condition of her bond.

\* \* \* \* \* \*

We agreed that, while we may not be lead counsel, we could clearly play a

---

8. Emphasis is in the original unless otherwise noted.

substantial role in the representation and that this was absolutely the desire of the client. It was also Helfand's desire, as his relationship with Lisa was shaky, at best, that we be the "point men" with Lisa, because he did not want to have much contact with her.

\*　　\*　　\*　　\*　　\*　　\*

*The Work Done*

Longest & Gavin knew at the time of our discussion with Lisa and after our discussion with Barry Helfand that day, (May 3, 1990) that we would be working on her case (criminal) and that we would also have all her civil work responsibilities. Nothing changed Longest & Gavin's opinion of what was happening for several months. Longest & Gavin prepared memos, hired and worked with the experts and the private investigator, James Roby, spoke with Lisa and her doctors. Nearly each day we reviewed for hours with her, her memory of the events that day and before. We prepared the draft of the Bond Review Motion for Barry and Alan. We prepared memos on privilege, we worked on and interviewed fact witnesses. We met with her almost daily at the jail and took countless hours of collect phone calls at work and home, day and night, from the day she was incarcerated until the Bond Hearing. We met with the lawyers and with the investigator, James Roby, we were able to establish that the murder of Tim Warner could not have occurred as the police believed that it, in fact, had. Longest & Gavin hired a forensic expert from Texas to review the autopsy (and arranged for a delay in release of the body until he could fly here and do so) and reviewed with him on several occasions his opinion on the cause and time of death. We worked with a specialist (Admiral Davies, U.S.N., Ret.) in the field of photography to analyze a photograph that had been taken of the victim at the crime scene by Robert Miller. We spent days preparing for and recreating the crime scene so that a photo could be taken on a day when the sun would be in the exact same position as it was on the day of the shooting. We worked with Admiral Davies, an expert in recreating and ascertaining times photographs were taken, in doing this. This process uses the placement of the sun, cloud conditions, etc. We were able to establish that the representations of the private investigator (Robert Miller) as to the time that the picture was taken were not consistent with the position of the sun, cloud cover, trees, etc. on that day. No other members of the defense team did this or attended the field experiments.

Between April, 1990 and August, 1990, Longest & Gavin was devoting in excess of 60% of its total firm time and resources exclusively to the Lisa Rubin matters. Other work was turned away, business opportunities were lost, and Lisa was a constant fixture in our office after her release on bond on about June 1, 1990. (She complained that Fred, Barry and Alan were not seeing her enough, not working on the case, and that we were the only ones working on it.) She constantly reviewed with us anything that anyone else told her, including her other attorneys. And this virtual daily contact and relationship with the office continued through the trial and her conviction. Mr. Gavin attended all of her probation appointments which were nearly every other Thursday until trial in November. (Barry, Fred and Alan did not attend at all because they did not want this daily contact with her.)

At the onset of the situation concerning the probation appointments and knowing that whatever part Longest & Gavin played seemed to be an irritant to the prosecutors, Lisa contacted Fred Joseph and asked if he thought that Mr. Gavin's going with Ms. Rubin at her request to these appointments would become known to the prosecutor and cause any further irritating factors. Longest and

Gavin was even told by Fred Joseph to go and it would not so irritate the scene, so Mr. Gavin accompanied Ms. Rubin every other Thursday from approximately 10:00 a.m. to 1:00 p.m. (sometimes earlier and sometimes later). During each day of her trial, Ms. Rubin would come to the office of Longest & Gavin and leave her car. Our secretaries would drive her over to the Court and then pick her up for lunch and take her back and usually pick her up at the end of the day. We discussed daily what was happening in her trial and gave her advice as requested on what was happening, as well as answering her questions about the process, which she clearly did not seem to understand. During the majority of the trial, Longest & Gavin stayed away from the Courthouse to avoid irritating the situation. We spent so much time with her that she used one of beepers to stay in touch, and she used one of our offices for her business affairs, and our staff took messages for her at our office.

\* \* \* \* \* \*

We also talked about the fact that unless Longest and Gavin were involved in the representation of Lisa Rubin, a significant problem concerning privilege and what she said to them may occur at a later time.. We do not really know who suggested it, but somebody at the table suggested that between the lawsuits that were imminent from her deceased husband's family (their attorneys had already contacted Longest and Gavin about claims against Lisa for her husband's wrongful death and at that time what we believed would be litigation against Lisa Rubin by Steven Pavsner ..., representing her mother (attempting to get her to sign over her interest in a million dollar piece of property) and the managing of her business affairs ... someone suggested that there was a

whole lot of civil and criminal work, that if we could <u>honestly</u> say that we were doing that, then just about <u>anything</u> she said to us about anything would be covered by the privilege.[9]

C) Longest's testimony at the post-conviction hearing essentially confirmed the statements of the February, 1991 letter:

Q. And as well as the firm of Longest and Gavin's name wasn't on there [the Retainer Agreement], but it was still understood that Longest and Gavin would be serving as counsel in the case?

A. Absolutely.

\* \* \* \* \* \*

Q. And one of the areas you researched the most was the issue of privilege; am I correct?

A. Yes.

Q. You provided detailed memorandums of law to the defense team with regard to the attorney-client privilege issue?

A. I think you would call them exhaustive.

\* \* \* \* \* \*

Q. Now you, even as close to the trial as two weeks beforehand, had a meeting with all of co-counsel—Mr. Joseph, Mr. Goldstein, Mr. Helfand, Mr. Gavin and yourself to discuss possible defense strategies, am I correct?

A. It was sometime shortly before trial, yes ... certainly within a few weeks.

\* \* \* \* \* \*

Longest also acknowledged his awareness of his own potential exposure to criminal prosecution during his representation of Rubin:

Q. ... And how come [the meeting of the Rubin defense team] was done at Mr. Kemp's office?

---

9. This last passage is taken out of the sequence in which it appears in the letter. Longest and Gavin, it may be noted, prevailed in the fee dispute and apparently remitted nothing to Rubin.

A. I am not quite sure how that all came about. There had been an earlier inquiry that had caused Mr. Kemp to become involved in representing myself, and he simply offered to have the meeting, and it was convenient to everybody, and that is where it occurred.

Q. ... What was the matter in which the inquiry was made of you that you needed Mr. Kemp's assistance?

A. Well, there was a question raised as to whether or not Mr. Gavin or myself had handled evidence or the property that was received from Ms. Rubin in an appropriate fashion. And that involved a discussion or presentation before the grand jury, and I felt it appropriate to have representation at that time, and Mr. Kemp represented me, and ... that was the reason for his involvement.

\* \* \* \* \* \*

Q. Nevertheless Mr. Kemp was serving in the capacity of representing you and Mr. Gavin at that time?

A. I don't know that he represented Mr. Gavin. I think Mr. Gavin had separate counsel to the best of my recollection, but I just do not recall.

\* \* \* \* \* \*

Q. Well with regard to any conflict that you had in continuing to represent Ms. Rubin, there was no request that she sign off on any waiver of conflict?

A. As I said before, and I wasn't trying to be careful with my words, I said there was a potential for a perceived or apparent conflict of interest. I don't believe there was one. In fact, the client certainly did not want Mr. Gavin or myself away from her side during the course of these proceedings.

Q. So in your opinion, you did not believe that you had a conflict with regard to the representation of Ms. Rubin?

A. I didn't agree—I did not believe there was a conflict at all associated with what we agreed with her that we would do vis-a-vis the preparation for the trial.

Q. Okay. So you did not perceive a conflict with regard to representing her pursuant to the contract that was executed by Mr. Helfand and Ms. Rubin?

A. No. The appearance of a conflict that I am talking about is the fact that Mr. Gavin and Mr.—and myself were called to a place that was apparently near or at the scene of the homicide and potentially became—became potential witnesses with regard to some portions of what occurred after the homicide.

\* \* \* \* \* \*

Q. Okay. And with all these thoughts in mind, you did not have the client waive any conflict that existed in writing regarding your representation of her in this case with all those preexisting conflicts that you had; and I correct?

A. I am not aware of any written waiver, no.

Q. You never came to the Court's attention or had co-counsel—Mr. Helfand, Mr. Joseph, or Mr. Goldstein—that you know of bring it to the Court's attention that our co-counsel who are not seated with us have a conflict with our client, Ms. Rubin; is that correct?

A. I wasn't in the courtroom at any time with them, so I don't know what they represented to the Court.

Q. To your knowledge did they ever represent that to the Court either informally or formally?

A. I have no personal knowledge of it.

Q. Now you had retained counsel because of a grand jury investigation. Do you know the subject matter of the grand jury investigation?

A. It had to do with the handling of evidence.

Q. Okay. And would you agree with me that it had to do with the allegation of obstruction of justice?

A. Well, it is what it boils down to, yes.

\* \* \* \* \* \*

Q. And with that in mind, you never filed any formal pleading or requested trial counsel who you were covered under a contract with to file any formal pleading with the Court acknowledging that one of the witnesses in the case had a conflict and was also representing Ms. Rubin—namely, yourself; am I correct?

A. No, I think you are wrong because I recall a hearing in the chambers of Judge J. James McKenna in which those—if not all, at least some of those issues were discussed.

\* \* \* \* \* \*

Q. Mr. Longest, would you elaborate on the hearing that was—or at least the matter that was brought before Judge McKenna that you referred to just a few moments ago?

A. There had been a meeting in the office of the State's Attorney in this courthouse at which I think Mr. Sonner was present. Mr. Campbell was present, and I believe Tom Tamm was there. If I am not mistaken, I think Barry Helfand was there, Mr. Gavin, and myself were. There was a discussion about whether or not Mr. Gavin and I could enter our appearance or keep our appearance—I don't know if it had already been entered—but keep our appearance in this case.

And it was the position of the State's Attorney's Office that we should not, and that was followed up with a conference for that purpose to explain why we were not going to have our appearance in the case with Judge McKenna.

\* \* \* \* \* \*

*And we told Judge McKenna what had occurred,* not specifically what had given rise to the potential for a conflict, *but that one was potentially there,* and that we were going to withdraw our appearance from the case or not enter it, whichever the case might have been. (Emphasis supplied)

I think it had already been entered a day or two before this conference or perhaps the same day. I don't remember—and explained why there was going to be a withdrawal, and counsel—other counsels' appearance was going to be substituted, and that is how it came about.

\* \* \* \* \* \*

Q. Okay. And Ms. Rubin was not at that meeting with Judge McKenna; am I correct?

A. No. She was not.

\* \* \* \* \* \*

Q. You at no time, at no time went to Barry Helfand, your friend, your business partner, and said, Mr. Helfand, I will fall on my sword. I will take an allegation of obstruction of justice because that is in the best interest of Lisa Rubin, our client. You never did that, did you?

A. I had no reason to do that.

Q. No. What you did was you, while you served as her co-counsel, insulated yourself from criminal prosecution by formally retaining your own attorney in the case of State of Maryland versus Lisa Rubin. Did you not do that?

A. I didn't do that.

Paul Kemp provided his own recollection of his representation of Longest during the Rubin proceeding:

Q. Did there come a time in 1990 that you represented, formally, Darryl [sic] Longest?

A. I did. In 1990 and then for at least half of 1991. Yes.

Q. All right. Would that have been in connection with the matter of State of Maryland vs. Lisa Joyce Rubin and his activities specifically on or about two days, April 24th, 1990 and April 25th, 1990, before she surrendered?

A. Yes. I don't know the day of the shooting. It would have been the evening of the shooting, very definitely, into the early morning hours, the next day and the day after that. So, the activities about which Mr. Longest and Mr. Gavin were investigated—and I represented only Mr. Longest—was technically three dates, three calendar days.

Q. Did you representation involve the possible claim by prosecuting officials that Mr. Longest may have, in some respects, obstructed justice in connection with the investigation of the case of Lisa Rubin?

A. Yes. It did.

Q. Now, the trial on this case occurred in November of 1990, the murder trial.

A. ... Yes.

Q. Were you still representing him at that time, Mr. Longest?

A. Yes.

Q. Was an investigation still pending against Mr. Longest at that time?

A. Oh, yes. Very definitely.

Q. Did there come a time in 1991 that you represented Mr.—that you, as the attorney for Mr. Longest, appeared with Mr. Longest for a grand jury appearance in this county?

A. Yes, sir.

Q. Do you have the date of that?

A. Yes ... The date I have for Longest and Gavin grand jury appearance, first, is May 9th, 1991. The second one is the following Thursday, and that would have been May 16th.

\* \* \* \* \* \*

Q. So, can you tell the Court whether or not both up and including the trial and into May of 1991 an active investigation was still pending against Mr. Longest for his possible obstruction of justice in regards to activities of April 24th and 25th, 1990, if the murder occurred on the evening of April 24th?

A. Yes. It persisted at least through May 16th of 1991. And on that date, we were informed by Mark Foley, who was the specially appointed Assistant State's Attorney, that the grand jury had elected not to charge them.

D) The Court of Special Appeals took particular note of Longest, Gavin, and Helfand's testimony at the post-conviction hearing regarding their respective roles as co-counsel:

(1) *Gavin:*

Q. Were you privy to the trial strategy meetings that those three individuals that you have named, Helfand, Joseph and Goldstein—were you involved in the trial planning strategy sessions?

A. No.

Q. Did you attend the trial in any way?

A. No, Sir.

(2) *Longest:*

Q. Now you indicated in your direct examination, Mr. Longest, that you had your job carved out for you in connection with this representation of Lisa Rubin. A fee was agreed upon, and you did your job; is that correct?

A. Yes.

Q. Barry Helfand, Al Goldstein, and Fred Joseph had their job?

A. That is correct.

Q. Is that fair to say? Were they acting independent of you as it relates to the defense of this case in court?

A. Sure.

Q. Did you exercise any veto power over the tactical, legal, factual, or whatever kind of decision that they

made between themselves—the three attorneys whose appearance was in this case?

A. Never.

Q. Would it be fair to say that you acted as a supplement in the behind-the-scenes preparation of this case?

A. Very much so.

Q. Do you know for a fact what use or in what way the information you brought to Mr. Helfand, Mr. Joseph, and Mr. Goldstein—how your information, how our input was integrated into their defense preparation?

A. No, never participated even in those defense preparation conferences.

(3) *Helfand:*

Q. At any point was trial strategy or was an investigative tactic dictated by Darrel Longest and David Gavin?

A. Oh, no come on. A trial strategy?

## V.

In its second opinion on appeal from the post-conviction court's order granting Rubin a new trial, the Court of Special Appeals cited *Cuyler v. Sullivan,* 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980), as precedent for analyzing an attorney conflict of interest case. While the court concluded that the post-conviction judge

had not erred in finding that Longest and Gavin continued to serve "as counsel on ... behalf" of Rubin through trial,[10] it determined that they "were not responsible for deciding upon or for carrying out Rubin's trial strategy. They did not enter their appearance to represent [Rubin] at trial." *Rubin,* slip. op. at 6–7. Rubin, the court pointed out, had hired "three outstanding attorneys" as her defense team to represent her at trial and, "[a]lthough Longest and Gavin had some association with [her] case after April 25, 1990, their 'contribution' consisted of what is most accurately described as 'paralegal/investigative' work that was of dubious assistance to the defense and 'client relations' that had nothing to do with trial strategy." *Id.* at 7. Longest and Gavin, said the court, performed only "behind the scenes efforts," which "had no impact whatsoever on the defense team's trial strategy." *Id.*

The court therefore rejected the post-conviction hearing judge's conclusion that Longest and Gavin were in a conflict of interest situation for effective assistance purposes:

(1) [I]n light of Longest's testimony at the suppression hearing,[11] the choice to refrain from presenting either Longest or Gavin to the jury was a strategic decision well within the range of reasonable competence; and

(2) [T]he choice to offer testimony was neither Longest's or Gavin's to make. Neither rendered "ineffective assis-

---

10. This was the concession the Court of Special Appeals made in its second opinion after finding in its first opinion that Longest and Gavin's representation terminated on April 25, 1990, the day following the homicide.

11. As to Longest's testimony at the suppression hearing, the Court of Special Appeals stated:

The Court of Appeals noted that, at the suppression hearing, Longest testified that neither he nor Gavin had suggested registering Mrs. Rubin under a false name but that the decision to use a false name was made by Miller at the hospital. 325 Md. at 564 n. 3, 602 A.2d 677.

*Rubin,* slip. op at 10 n. 2.
The Court of Appeals footnote referred to states:

At the suppression hearing Longest testified that he first learned from Miller that the decision had been made at the hospital to register Rubin under a false name. 325 Md. at 564 n. 3, 602 A.2d 677.

However, the *text* in the Court of Appeals Opinion to which that footnote refers in fact finds just the opposite, to wit:

Longest further instructed Miller and Leopold to take Rubin to the hospital, get her admitted, and to use an alias. 325 Md. at 564, 602 A.2d 677.

tance" because they did not testify at trial about their dealings with . . . [Rubin] on April 24 and 25.

*Id.* at 8. Accordingly the court held "as a matter of law that, unless counsel could have prevented the happening of the deficient act, he or she cannot have rendered ineffective assistance." *Id.*

Finding no actual conflict, the court did not address the issue of whether Longest and Gavin's representation of Rubin might have been adversely affected. Neither did it address the possible conflict posed by the criminal investigation that Longest and Gavin themselves continuously labored under while representing Rubin.

## VI.

Rubin makes three claims of constitutional error on the part of the Maryland appeals court:

1) That it unreasonably applied clearly established Supreme Court precedent when it failed to recognize her right to conflict-free counsel during the pre-trial stages of her case, *i.e.* on April 24–25, 1990;

2) That it unreasonably applied that precedent when it failed to recognize her right to conflict-free counsel even if, as of the time of trial, counsel were functioning only in a paralegal/investigative capacity as opposed to serving as trial counsel; and

3) That its decision that Longest and Gavin acted in a merely "paralegal/investigative" capacity was based on an unreasonable determination of the facts in light of the evidence presented in the post-conviction state court proceeding. 28 U.S.C. § 2254(d)(2), and that those facts, while presumed to be correct, are overcome by clear and convincing record evidence. 28 U.S.C. § 2254(e)(1).

## VII.

A) Since this case was filed after enactment of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub.L. No. 104–132, 110 Stat. 1214, the Court applies 28 U.S.C. § 2254 as amended by AEDPA. *See Lindh v. Murphy,* 521 U.S. 320, 327, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997):

The statute reads in pertinent part:

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; . . . . or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

In *Williams v. Taylor,* 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000), the Supreme Court elaborated upon the meaning of the statute's key clauses:

As for the "contrary to" clause:

A state court decision will certainly be contrary to our clearly established precedent if the state court applies a rule that contradicts the governing law set forth in our cases . . . . A state-court decision will also be contrary to this Court's clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of this court and nevertheless arrives at a result different from our precedent.

529 U.S. at 405–06, 120 S.Ct. 1495.

As for the "unreasonable application" clause:

. . . a state court decision can involve an "unreasonable application" of this Court's clearly established precedent in two ways. First, a state court decision involves an unreasonable application of this Court's precedent if the state court identifies the correct governing legal

rule from this Court's cases but unreasonably applies it to the facts of the particular state prisoner's case. Second, a state-court decision also involves an unreasonable application of this Court's precedent if the state court either unreasonably extends a legal principle from our precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply.

*Id.* at 407, 120 S.Ct. 1495.

The Court went on:

Stated simply, a federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable.

*Id.* at 409, 120 S.Ct. 1495.

For purposes of today's opinion, the most important point is that an unreasonable application of federal law is different from an incorrect application of federal law.

*Id.* at 410, 120 S.Ct. 1495.

\*     \*     \*     \*     \*     \*

Congress specifically used the word "unreasonable," and not a term like "erroneous" or "incorrect." Under § 2254(d)(1)'s "unreasonable application" clause, then, a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable.

*Id.* at 411, 120 S.Ct. 1495.

■ B) The right to the effective assistance of counsel under the Sixth Amendment includes the right to representation free of conflicts of interest. *Cuyler v. Sullivan,* 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333; *see also United States v. Tatum,* 943 F.2d 370, 375 (4th Cir.1991). To establish ineffective assis-

tance in a conflict of interest situation, a defendant who raised no objection at trial must establish (1) that her attorney labored under an actual conflict of interest and (2) that counsel's representation was adversely affected by the actual conflict. *Cuyler,* 446 U.S. at 348, 100 S.Ct. 1708. If these two conditions are met, prejudice will be presumed; a defendant is not required to show that the conflict altered the outcome of the proceeding. *Id.* at 349–50, 100 S.Ct. 1708.

■ The Fourth Circuit has held that:

To establish an actual conflict of interest, the petitioner must show that his interests "diverged with respect to a material factual or legal issue or to a course of action."

*Williams v. French,* 146 F.3d 203, 212 (4th Cir.1998) (quoting *Cuyler,* 446 U.S. at 356 n. 3, 100 S.Ct. 1708). Actual conflicts can arise at pre-trial stages as well as at trial. *Holloway v. Arkansas,* 435 U.S. 475, 489–90, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978); *Burket v. Angelone,* 208 F.3d 172, 185 (4th Cir.2000); *United States v. Magini,* 973 F.2d 261 (4th Cir.1992); *United States v. Tatum,* 943 F.2d at 376 (4th Cir.1991). An attorney's interests may diverge from those of his client at that stage in a number of ways. He may fail to investigate or pursue a line of defense or seek a plea agreement because of a duty owed to a second client. *Id.* He may counsel a plea to protect a fee. *Magini,* 973 F.2d 261. Or he may become so "entangled" in the criminal activity that is the subject of the client's suit that he fails to act in the client's interest in order to protect his own. *Reckmeyer v. United States,* 709 F.Supp. 680, 688–89 (E.D.Va.1989). As suggested by all these cases, the inquiry as far as pre-trial counsel is concerned is essentially no different from that for trial counsel: Did counsel operate under an actual conflict? Did that conflict adversely affect the attorney's representation?

## VIII.

■ A) There is no question that the Court of Special Appeals glossed over the issue of Rubin's entitlement to conflict-free counsel during the stages prior to trial. In a footnote to its opinion, the court recognized that "(r)epresentation rendered before trial can be ineffective," *Rubin*, slip. op. (7/28/98) at 6 n. 1, citing, for example, an attorney's failure to pursue a plea bargain on account of a conflict of interest. But, the court went on to say, "the hearing judge did not find that ineffective assistance occurred before trial." *Id.* Hence it inquired no further.

This characterization of the post-conviction court's finding by the intermediate appeals court is puzzling, to say the least.

Quite clearly, the post-conviction court found an actual conflict on the part of Longest and Gavin in the pre-trial stages:

> The conflict between Longest, Gavin and Petitioner is that in order to fully represent their client, the interests of their client must come before their interests. Longest and Gavin put their interest in collecting a fee and insulating themselves from potential criminal changes before the interests of Petitioner.

*State v. Rubin*, Crim. No. 59303, slip op. at 8 (Cir Ct. for Montgomery County, Md., Mar. 3, 1997). He further found, by implication if not explicitly, that this conflict had a *continuously* adverse effect on their representation of Rubin. Every one of the actions Longest and Gavin took—from remaining in the case, to attempting to waive a preliminary hearing and grand jury indictment, to investigating leads, to preparing witnesses, to preparing memoranda on the privilege issue, and finally to not testifying at trial—was tainted by their conflict. Necessarily, then, the post-conviction hearing judge found that Longest and Gavin rendered ineffective assistance at both the pre-trial and trial stages.

The Court of Special Appeals, it should be emphasized, left wholly intact the finding of the post-conviction hearing judge with regard to Longest and Gavin's activities on the night of the homicide. They arrived at the scene of the crime and:

1) removed, if not tampered with evidence;

2) directed Rubin to leave the scene;

3) directed the private investigators to place Rubin in the hospital under an alias;

4) after calling the police, denied to them that they represented Rubin; and

5) failed to present Rubin to the police for nearly 24 hours, after escorting her to her bank in order to have her withdraw $105,000 to pay their retainer.

But if this was true, it is patently clear that by their actions Longest and Gavin immediately became fact witnesses not only as to the scene of the crime but as to their client's actions in the 24 hours immediately following. They counseled actions that, if not explained, might (in fact did) lead the prosecution at trial to argue that Rubin acted with premeditation and that her flight evidenced consciousness of guilt. Testimony by either of the attorneys at trial was available to dispel those notions. At the same time, Longest and Gavin immediately exposed themselves to (and in fact immediately, up to, through, and after trial were investigated by the grand jury for) possible obstruction of justice and hindering the apprehension of a criminal defendant, if not criminal conspiracy. By the time of trial, Longest for certain and possibly Gavin had engaged attorneys to represent them in that regard. In consequence, they became hopelessly "entangled in the conduct charged against the client." *Reckmeyer*, 709 F.Supp. at 688; *see also Government of the Virgin Islands v. Zepp*, 748 F.2d 125, 136 (3d Cir.1984) (actual conflict found where counsel had personal interest in avoiding potential criminal and disciplinary charges for destroying evidence in client's case). In addition, their interest in securing a healthy retainer caused them to counsel Rubin to act in unnecessarily suspicious fashion when they caused her to delay her surrender to the police for 24

hours. *Cf. Magini*, 973 F.2d 261 (case remanded for evidentiary hearing to determine whether attorney's interest in protecting fee caused him to counsel unfavorable plea). It was objectively unreasonable for the Court of Special Appeals to conclude other than that Longest and Gavin's personal interests conflicted with objectives of their representation of Rubin counting almost from the moment they arrived at the scene of the crime.

The Court, moreover, finds that Longest and Gavin's actions in the days following their appearance on the scene of the homicide, even before they associated with Barry Helfand et al., adversely affected both their own and eventually Helfand's performance, an issue the Court of Special Appeals never reached.

On April 27, 1990, three days after the homicide, Longest and Gavin—and they alone—entered an appearance on behalf of Rubin in the District Court for Montgomery County and waived a preliminary hearing. Although a preliminary hearing is not a forum for discovery, *see Timbers v. State*, 2 Md.App. 672, 236 A.2d 756 (1968), the fact is that at least some witnesses may be called by the State and, if called, may be cross-examined. *See Kardy v. Shook*, 237 Md. 524, 207 A.2d 83 (1965). While a preliminary hearing is sometimes said to be of limited utility and is often waived, in this case it is quite as reasonable to infer that, by waiving the hearing, Longest and Gavin were attempting to divert the spotlight from their own conflict and the possibility that their disqualification from case would be immediately sought. Longest and Gavin's effort to divert attention from their own conflict is similarly evidenced by their request to Assistant State's Attorney Tamm to forego an indictment against Rubin and proceed on the basis of an information (*see* testimony of Tamm at text at p. 855, *supra*). The grand jury, as it turned out did indict Rubin, but for present purposes the point is that Longest and Gavin tried to get the State to waive presentment, not that they succeeded or failed in having that happen.

The adverse effect of their conflict on their representation of Rubin did not abate when, within a week of the crime, Longest and Gavin advised her to engage Helfand as trial counsel. Longest and Gavin remained in the case as co-counsel (their fee was $150,000, Helfand et al.'s was $100,000), wrapping themselves in the attorney-client privilege and thereby assuring that they would never be asked to testify at trial. If they did not help craft it, at the very least they acquiesced in the attorney-client privilege as the foundation of the defense case, a device perhaps for attempting to block any testimony by the private investigators who were with Longest and Gavin at the scene of the crime, but at the same time one that virtually sealed off access to any testimony from the two of them.

Nothing in the record suggests that Rubin understood, much less intelligently waived, the continuing conflict that this defense strategy incorporated. Longest and Gavin's statements in their letter of February, 1991 indicate just how much Rubin was misled in this regard, a consideration that the Court of Special Appeals also failed to address. In explaining to Rubin why they needed to stay in the case, Longest and Gavin mentioned only the possibility of future civil litigation against Rubin and that, if they remained, Rubin could say "just about anything ... to us about anything" and "be covered by the privilege." Nothing in the letter, nor indeed anything said at the post-conviction hearing, suggested that Rubin was ever told that having Longest and Gavin step out of the case might be to her benefit, that it might help explain to the jury why she acted as she did following the homicide. Nowhere did Longest and Gavin reveal to Rubin that their remaining in the case would serve their own interest in avoiding disclosure of potentially criminal

actions that they themselves had taken.[12] Indeed, one of the more disturbing statements that appears in the Longest/Gavin letter is that "they prepared memos on privilege." While those memos are not in evidence, one can only suppose that they too were devoid of any reference to the possible benefits Rubin might gain by waiving her privilege and calling Longest and Gavin as witnesses in the case.[13]

Since the Court of Special Appeals failed to make factual findings regarding the existence *vel non* of an actual conflict of interest on the part of Longest and Gavin at the pre-trial stage, it remains for this Court to do so. Joining the post-conviction hearing judge in his conclusion, the Court finds that Longest and Gavin did in fact labor under an actual conflict during that phase. The Court further finds that this conflict adversely affected their representation. The failure of the Maryland Court of Special Appeals to make these findings was not merely erroneous or incorrect. It was an objectively unreasonable application of clearly established Supreme Court precedent regarding Rubin's right to conflict-free counsel.

■ B) Rubin next argues that even if, as the Court of Special Appeals found, Longest and Gavin played only a "paralegal/investigative" role through trial and did not control trial strategy, the court unreasonably applied clearly established Supreme Court precedent by finding as a matter of law that the attorneys could not have an actual conflict of interest. The Court will discuss presently discuss why, from a factual standpoint, it deems the Court of Special Appeals to have been clearly erroneous and objectively unreasonable in concluding as a matter of fact that Longest and Gavin only played a paralegal/investigative role but, for present purposes, it will be assumed that their role was limited to that.

From a review of the record, especially the extraordinary Longest/Gavin letter of February 21, 1991, it is apparent that, at the very least, Longest and Gavin investigated the case, handled preliminary proceedings, arranged for and prepared witnesses for trial, and prepared legal memoranda, including memoranda on the issue of attorney-client privilege which they submitted to trial counsel Helfand and others. It is indisputable, therefore, that what they did helped to bring trial counsel "up to speed" for purposes of trial. It is likewise certain that even if Helfand, et al. alone made decisions regarding strategy, Longest and Gavin at all times remained part of the defense

---

**12.** One statement in the Longest/Gavin letter of February 21, 1991, distinctly untrue and supported by no evidence whatsoever, is that they acted in an ethically correct manner with full disclosure to the client. This they did not do. Rule of Professional Conduct 1.7, dealing with conflict of interest, provides:

> (b) A lawyer shall not represent a client if the representation of that client may be materially limited ... by the lawyer's own interests, unless:
> (1) the lawyer reasonably believes the representation will not be adversely affected; and
> (2) the client consents after consultation;
> (c) The consultation required by ... (b) shall include explanation of the implications of ... any limitations resulting ... from the lawyer's own interests, as well as the advantages and risks involved.

Longest and Gavin never consulted with Rubin within the terms of the rule because they never explained to her the implications of any limitations resulting from their own interests, or the advantages or risks involved. Consequently Rubin never consented to her representation by Longest and Gavin "after consultation."

Additionally, nothing in the record indicates that Helfand et al. ever advised Rubin of the conflicts Longest and Gavin actually faced or that they obtained a waiver from her to keep Longest and Gavin in the case notwithstanding their conflict.

**13.** Insofar as it might be argued that Longest and Gavin received the blessing of Circuit Court Judge McKenna to remain in the case despite their "potential conflict," the judge, it will be remembered, was never told what the conflict was, *supra*, p. 860. In fact it appears that Judge McKenna was never told that Longest and Gavin were going to remain in the case at all, much less to the extent they actually did.

team. The conflicts that they had created in the first 24 hours after the homicide never disappeared or diminished.

Again, the right to conflict-free counsel is clearly established Supreme Court law. This "generalized standard" is "sufficiently clear for habeas purposes," *Williams,* 529 U.S. at 382, 120 S.Ct. 1495 (Stevens, Souter, Ginsburg and Breyer, JJ., concurring), to apply to co-counsel who, even if not stated at counsel's table, participate in an active way in preparing for trial proceedings, whether drafting legal memoranda or readying witnesses for trial.

In the *Tatum* case, which—one can only express amazement—involved the same David Gavin who the Court finds was conflicted here, the Fourth Circuit discussed the "taint" that a conflicted attorney can have upon trial counsel. Gavin was deemed conflicted there because, among other things, in defending his client for failing to include assets on a bankruptcy schedule, he deflected attention away from his own law firm,[14] which apparently had advised the client to do what he was being prosecuted for. While the Fourth Circuit refers in several places in *Tatum* to the fact that Gavin sat at counsel table with his co-counsel Paul Kemp,[15] Rubin is correct in her argument before this Court that the mere presence of counsel at counsel's table or the fact of "control" of the litigation were not crucial considerations in *Tatum.* What mattered in *Tatum* was the functional role Gavin played *vis-à-vis* Kemp, which was to keep him "up to speed."

As Kemp told the trial judge in *Tatum,* Gavin had represented the defendant "throughout the grand jury stages of this case and in various attendant civil matters. He has, at the request of the defendant, been helping ... throughout the presenta-

tion for this trial which ... is very complicated and he has been assisting me to try and bring me up to speed in the investigation ... I would at least like him available to assist me insofar as pointing out details that may come up ...."

At which point the trial court observed:

Well, I gather from what Mr. Kemp said that Mr. Gavin is going to be more in a consultative stance than in a participatory stance.

Mr. Kemp: That is correct, Your Honor.

*Tatum,* 943 F.2d at 378.

The Fourth Circuit elaborated on Gavin's role: "Kemp depended on Gavin to brief him on both the facts and the prior proceedings .... Gavin was an acknowledged source of information to Kemp .... [T]he presentation of Tatum's defense was the product of both Gavin and Kemp, even though their contributions may have varied in function and degree." *Id.* In consequence, said the court:

This joint effort by the two, when one was so completely disqualified, caused an unwitting, but disqualifying, taint to the other.

*Id.*

Whether or not Gavin was present at counsel table, "Kemp's knowledge of the case and the avenues for defense depended on Gavin's more complete knowledge." *Id.* It was, therefore, "infected by Gavin's conflicts." *Id.* Among other taints, "it would never occur to Kemp to call Gavin as a witness in an effort to shift ... the blame for the loss of the file containing possibly exculpatory evidence." *Id.*

Were there any doubt about the matter, the *Tatum* court was at pains to emphasize that its decision did not depend on Gavin's trial assistance in representing the client.

---

**14.** Darrel Longest, whom the Court also finds conflicted here, was identified as a member of Gavin's firm in *Tatum.* It was in part because Longest would have been a witness adverse to Gavin's client there that the Fourth Circuit Court found a conflict to exist.

**15.** The Court notes that Kemp was also the attorney Longest retained when he realized he was under investigation by the grand jury for his conduct in the present case.

Noting applicable Supreme Court precedent, the Fourth Circuit held:

> Even if we were to consider only Gavin's direct representation of Tatum, our conclusions in this case would not be different. Before Kemp entered his appearance for Tatum, Gavin's representation resulted in an actual lapse, because he did not think to invite the government to alter the focus of its investigation from Tatum to his law firm as part of a plea bargain. As observed by the Supreme Court in *Holloway,* a conflict of interest has constitutionally detrimental effects before trial, just as during trial, because of what it tends to prevent the attorney from doing.
>
> \*      \*      \*      \*      \*      \*
>
> We find that Gavin's actual conflicts of interest adversely affected Tatum's defense when he alone was representing Tatum .... While Kemp alone did not represent conflicting interests, his defense of Tatum was tainted by his dependence on Gavin.

*Id.* at 379 (citation omitted).

The present case replays *Tatum* almost exactly. The same David Gavin, this time joined by his partner Darrel Longest, is under scrutiny for conflict of interest. Here, as in *Tatum,* the attorneys represented their client during the preliminary stages of the case and in attendant civil matters, helped throughout the presentation for trial (at the request of the client), and assisted the trial attorneys by bringing them "up to speed." As the *Tatum* trial judge observed of Gavin, Longest and Gavin in the present case may have been "more in consultative stance than in a participatory stance," but as in *Tatum,* the trial attorneys clearly depended on them to brief them on both the facts and the prior proceedings. As in *Tatum,* the presentation of Rubin's defense was necessarily the product of both Longest/Gavin and Helfand/Goldstein/Joseph, "even though their contributions may have varied in function and degree." *Id.* at 378. Here, in consequence, as in *Tatum:*

> [The] joint effort ... when one [group] was so completely disqualified, caused an unwitting, but disqualifying, taint to the other.

*Id.*

Finally, considering only Longest and Gavin's "direct representation" of Rubin, the result, just as in *Tatum,* was an "actual lapse" on their part. They never thought to remove themselves from the case altogether so that they might become witnesses on her behalf. They never thought to draw the State's attention to their own actions regarding the handling of evidence at the crime scene or in causing the 24 hour delay in Rubin's surrender.

The question in this case was always premeditation and deliberation, not whether Rubin committed a homicide. The several actions Longest and Gavin directed Rubin to take made the homicide look more premeditated and more deliberate. By failing to draw the spotlight on their own actions, whether for financial reasons (to remain in the case and gain a substantial fee) or out of fear for their own criminal liability, they lapsed in their duty of representation. The holding of the Court of Special Appeals that counsel as deeply conflicted as Longest and Gavin were could remain active in the case so long as they did not sit at counsel table or control trial strategy constitutes a second objectively unreasonable application of clearly established Supreme Court precedent regarding Rubin's right to conflict-free counsel.

C) Rubin's last argument is that the decision of the Court of Special Appeals that Longest and Gavin played only a "paralegal/investigative role" was based on an unreasonable determination of facts in light of the evidence presented in the court proceeding, *see* 28 U.S.C. § 2254(d)(2), in that its factual findings, presumed to be correct, are shown by clear and convincing evidence not to be. *See* 28 U.S.C. § 2254(e)(1).

In determining that Longest and Gavin played that limited role, the appeals court relied on the brief testimony Longest, Gavin and Helfand gave at the post-conviction hearing. Rubin insists that in fact the record evidence overwhelmingly demonstrates that Longest and Gavin's role was far more active.

█ A court ordinarily "accords great weight to a lawyer's perception of a conflict" when evaluating a conflicts claim. *See United States v. Young,* 644 F.2d 1008, 1014 (4th Cir.1981). *Young,* however, also states that "courts necessarily rely in large measure upon the good faith and good judgment of defense counsel in determining whether an actual conflict of interest exists." *Id.* (citation omitted). In view of the truly remarkable letter that Longest and Gavin wrote to the Maryland Attorney Grievance Commission within 3 months of the conclusion of the Rubin trial, there was and is, objectively speaking, every reason to doubt the good faith of Longest and Gavin's suggestion at the post-conviction hearing 5 years after the trial that their role was secondary and that they labored under no conflict. Their letter sets out in minute detail that Longest and Gavin served Rubin in a "multitude of ways . . . . even during the trial." The Court need not repeat that "multitude of ways" here.[16] It is enough to conclude that the Court of Special Appeals' minimization of counsel's role was clearly and convincingly unreasonable in light of this evidence. This, in the Court's judgment, represents a third basis for granting habeas relief in this case.

## IX.

Whether, in order to prevail, it suffices for Rubin to show that Longest and Gavin's interests merely diverged from hers with respect to a course of action, *see Williams v. French,* 146 F.3d 203, or whether she must identify a plausible alternative defense strategy or tactic that

might have been and was not pursued because of the actual conflict, *see Freund v. Butterworth,* 165 F.3d 839, 860 (11th Cir.1999) (*en banc* ), the result is the same. Longest and Gavin had a strong personal interest in not giving testimony about what they counseled Rubin to do and what they themselves did on the night of the crime and the day after, which diverged from Rubin's interest in having them testify on her behalf at trial. Under the *Williams* test, that alone suffices. But calling the attorneys as witnesses was unquestionably a plausible alternative defense strategy to not calling them. Moreover, the link between the attorneys' conflict and the defense strategy based on the attorney-client privilege is obvious, whatever argument might be proffered in support of the strategy adopted in the case. This would satisfy the *Freund* test.

Had Longest and Gavin been called to testify, the jury might well have reached a verdict of voluntary manslaughter, involuntary manslaughter, or even an acquittal based on self defense. But the Court is not required to go that far. Once it is established that an attorney labored under an actual conflict of interest that adversely affected his representation, prejudice is presumed; the defendant need not show that the tactic or strategy would have altered the outcome of the proceeding. *See Cuyler,* 446 U.S. at 349–50, 100 S.Ct. 1708. The Court is satisfied that Rubin has carried her burden here.

The Court of Special Appeals, from all appearances, reached a hasty judgment in this case. In its first opinion, issued without a full record and with less than full briefing, it found as a fact that Longest and Gavin ceased their representation of her on April 25, 1990, the day after the homicide. Then, on reconsideration, with a record before it, it was forced to conclude that Longest and Gavin had indeed engaged in "some" representation through trial, but chose to characterize the representation as being of a distinctly secondary

**16.** *See supra,* pp. 856 – 58.

nature. The second opinion, however, did little to ameliorate the shortcomings of the first. Objectively unreasonable errors of constitutional dimension remained. Those errors, in the Court's view, fully justify grant of the relief Rubin seeks.

## X.

The Court finds that Rubin's Sixth Amendment right to the effective assistance of counsel was denied by reason of conflicts of interest surrounding her attorneys Darrel Longest and David Gavin from the time they arrived on the scene of the crime up to and through the end of Rubin's trial.