Filed:  July 2, 2002

UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

No. 01-6411
(CA-99-621-PJM)

Lisa Joyce Rubin,

Petitioner - Appellee,

versus

Archie Gee, etc., et al.,

Respondents - Appellants.

O R D E R

The court amends its opinion filed June 5, 2002, as follows:

On page 19, footnote 1, line 2 -- the word "alibi" is corrected to read "alias."

For the Court - By Direction

/s/ Patricia S. Connor
Clerk

PUBLISHED

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

LISA JOYCE RUBIN,
    *Petitioner-Appellee,*

    v.                      No. 01-6411

ARCHIE GEE, Director; J. JOSEPH
CURRAN, JR.,
    *Respondents-Appellants.*

Appeal from the United States District Court

for the District of Maryland, at Greenbelt.

Peter J. Messitte, District Judge.

    (CA-99-621-PJM)

 Argued: October 30, 2001

  Decided: June 5, 2002

Before WILKINSON, Chief Judge, MOTZ, Circuit Judge, and

Malcolm J. HOWARD, United States District Judge

for the Eastern District of North Carolina,

  sitting by designation.

_____

Affirmed by published opinion. Chief Judge Wilkinson wrote the
opinion, in which Judge Howard joined. Judge Motz wrote a dissent-
ing opinion.

_____

## COUNSEL

**ARGUED:** Gary Eugene Bair, Assistant Attorney General, Criminal
Appeals Division, OFFICE OF THE ATTORNEY GENERAL, Balti-

more, Maryland, for Appellants. Fred Warren Bennett, BENNETT & NATHANS, L.L.P., Greenbelt, Maryland, for Appellee. **ON BRIEF:** J. Joseph Curran, Jr., Attorney General of Maryland, Criminal Appeals Division, OFFICE OF THE ATTORNEY GENERAL, Baltimore, Maryland, for Appellants. Michael E. Lawlor, BENNETT & NATHANS, L.L.P., Greenbelt, Maryland, for Appellee.

_____

### OPINION

WILKINSON, Chief Judge:

Lisa Joyce Rubin, a Maryland prisoner, claims she was denied the effective assistance of counsel and seeks federal habeas corpus relief. The district court granted a writ of habeas corpus, concluding that the state court's decision not to grant Rubin a new trial was an objectively unreasonable application of clearly established federal law regarding Rubin's right to conflict-free representation. *See Cuyler v. Sullivan*, 446 U.S. 335 (1980). Because two of Rubin's attorneys labored under a conflict of interest that adversely affected Rubin's representation, and because Rubin was denied the assistance of counsel by these lawyers' corruption of the attorney-client relationship from the night of Rubin's crime until the conclusion of Rubin's trial, we affirm the judgment of the district court.

The case involved two attorneys who in the aftermath of a crime schooled their client in the tactics of evasion in order to guarantee their own fee. Then to avoid criminal indictment and keep their conduct from coming to light, the attorneys took cover as part of the defense team. While the prosecution harped at trial on Rubin's actions immediately following the crime, the attorneys could not be called as fact witnesses and their role in directing Rubin's actions was never explained. To say this had an adverse impact on her trial is self-evident. To say the actions here tarnished the noble calling of criminal defense work is an understatement.

#### I.

On November 11, 1990, Lisa Joyce Rubin was convicted of first degree murder and the use of a handgun in a crime of violence. She

2

was sentenced to life in prison, with all but 30 years suspended, on the murder charge and a concurrent sentence of 20 years on the handgun charge. There is no question that Rubin shot and killed her husband, Timothy Warner. However, Rubin, the only defense witness called at trial, claimed she was acting in self-defense.

A series of events ultimately led to the homicide. During her marriage to Warner, Rubin had an affair with William Glisson. Rubin and Warner ended up bringing a civil suit against Glisson because Glisson assaulted Rubin during the affair. In the course of the civil trial, Glisson was poisoned when he drank out of a soda bottle containing cyanide.

After the civil proceeding against Glisson, Rubin and Warner separated. Rubin subsequently hired private investigators, Robert Miller and Robert Leopold, to determine whether Warner was having an affair. In April 1990, Rubin told Miller that Warner confessed to her that he had poisoned Glisson. Rubin claimed she was afraid of Warner and wanted to tell the police what she knew about the attempt on Glisson's life. Miller referred Rubin to Darrel Longest, an attorney, so that Longest could arrange for Rubin to meet with the police. On April 20, 1990, after Longest secured immunity for Rubin, Rubin and Longest met with a police officer to tell him about Warner's confession.

Four days later, on April 24, 1990, Rubin met Warner at a veterinary clinic to have their dog put to sleep. During a walk with Warner in the woods behind the clinic, Rubin told Warner that she had gone to the authorities about his confession. According to Rubin, Warner was enraged and pulled out what she believed to be a gun. Rubin then took a handgun out of her purse and shot Warner eight times.

After the shooting, Rubin proceeded back into the veterinary clinic and called Miller in an attempt to reach her attorney, Longest. Following Miller's instructions, Rubin met him and the other private investigator, Leopold, at a neutral location. The three of them then returned to the scene of the crime. Miller called Longest and his law partner, David Gavin, who both came to the crime scene. At that time, it became clear that Rubin had taken a lot of medication. So Longest told Miller and Leopold to take her to the hospital for a possible drug

3

overdose. However, Longest went one step further. In an apparent effort to have Rubin evade detection, Longest instructed Miller and Leopold to have Rubin admitted to the hospital under a false name. The attorney's instructions were meticulously executed.

While Rubin was in the hospital, Longest notified the police that Warner was dead. However, he never disclosed Rubin's identity or whereabouts. With Rubin still at large, Longest and Gavin were able to direct her actions in order to ensure themselves ample compensation. The day after the shooting, attorney Gavin drove Rubin to the bank so she could withdraw the sum of $105,000 to cover Longest and Gavin's retainer fee and expenses. Meanwhile, attorney Longest took possession of the evidence in the case. Longest took Rubin's jacket, her purse, some .22 caliber bullets, and a .38 caliber handgun and kept them at his law offices. Finally — only after the attorneys discovered that a warrant was out for Rubin's arrest — Longest and Gavin turned Rubin in to the police at 7:00 p.m. on April 25th.

Longest and Gavin continued to advise Rubin after the homicide. They recommended to Rubin who should serve as her trial counsel. They persuaded her to hire Barry Helfand, who in turn brought in Alan Goldstein and Fred Joseph. And remarkably, considering the post-shooting events, Longest and Gavin remained part of the defense team even after Helfand, Goldstein, and Joseph were brought into the case. Longest and Gavin continued to collect a fee from Rubin, even though they did not sit at counsel table during her trial.

Except for the fact that Rubin went to the hospital, none of the facts regarding the events following the homicide were brought out during Rubin's direct examination. And Longest and Gavin were not called to testify about their roles in directing Rubin's actions in the immediate aftermath of the shooting. However, the State brought out the events from the twenty-four hours following the homicide during Rubin's cross-examination, without any mention of Longest and Gavin's activities. The State used the facts to refute Rubin's self-defense claim by arguing that she had fled the scene of the crime, lied about her identity, and showed consciousness of guilt.

Following her conviction, the Maryland Court of Appeals granted certiorari and affirmed Rubin's conviction. *See Rubin v. State*, 602

4

A.2d 677 (Md. 1992). On September 29, 1995, Rubin filed a petition for post-conviction relief in the Circuit Court for Montgomery County. Following an evidentiary hearing, the post-conviction court granted Rubin's petition for a new trial, finding a conflict of interest between Rubin and defense attorneys Longest and Gavin that violated Rubin's Sixth Amendment right to counsel.

On appeal by the State of Maryland, the Court of Special Appeals reversed in an unreported decision. The Court of Special Appeals did not dispute the post-conviction court's factual findings regarding Longest and Gavin's actions after the homicide. And the court found that Longest and Gavin "served as counsel on behalf of Mrs. Rubin" up to and throughout her trial. However, the state court found that after the events following the homicide, Longest and Gavin's contribution to the defense team "consisted of what is most accurately described as `paralegal/investigative' work . . . and `client relations' that had nothing to do with trial strategy." Therefore, the Court of Special Appeals held that because Longest and Gavin did not control the decision of whether to offer their testimony at trial, and because it was a reasonable decision by Rubin's trial counsel not to call them, Longest and Gavin's "failure or refusal" to testify did not constitute ineffective assistance of counsel. The Maryland Court of Appeals denied Rubin's application for certiorari. *See Rubin v. State*, 719 A.2d 1262 (Md. 1998).

Having exhausted her state remedies, Rubin filed a petition for habeas corpus relief in the district court. On February 7, 2001, the district court granted Rubin's petition, finding that the Maryland Court of Special Appeals unreasonably applied the clearly established Supreme Court precedent of *Cuyler v. Sullivan*, 446 U.S. 335 (1980). The district court held that it was objectively unreasonable for the state court to conclude that Rubin was not denied the effective assistance of counsel by Longest and Gavin's conflict of interest during the pretrial and trial phases of Rubin's case. *See Rubin v. Gee*, 128 F. Supp. 2d 848, 865-69 (D. Md. 2001). The court stressed that it was unreasonable for the state court to conclude that "counsel as deeply conflicted as Longest and Gavin were could remain active in [her] case." *Rubin*, 128 F. Supp. 2d at 869.

Alternatively, the district court concluded that the state court's finding that Longest and Gavin played only a "paralegal/investigative

5

role" on Rubin's defense team was an unreasonable determination of the facts in light of the evidence presented in the state court, constituting another basis for granting Rubin habeas relief. The court noted that the evidence included a detailed letter from Longest and Gavin to the Maryland Attorney Grievance Commission explaining that "Longest and Gavin served Rubin in a `multitude of ways . . . even during the trial.'" *Id.* at 856-58, 869-70. The district court concluded that the state court's "minimization of counsel's role was clearly and convincingly unreasonable in light of this evidence." *Id.* at 870. Maryland now appeals.

II.

A.

Rubin filed her petition for a writ of habeas corpus after the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), so we apply 28 U.S.C. § 2254 as amended by the AEDPA. Rubin's claims were adjudicated on the merits in state court. Therefore, in order for federal habeas relief to be granted, the state court's decision must be "contrary to, or involve [] an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).[1]

The Supreme Court addressed the meaning of § 2254(d)(1) in *Williams v. Taylor*, 529 U.S. 362 (2000). The Court explained several ways in which a state court decision can be "contrary to" or an "unreasonable application of" clearly established federal law. *See Williams*, 529 U.S. at 405-07. Only one of the Court's explanations is relevant in this case: A state court decision is an unreasonable appli-

_____

[1] Pursuant to § 2254, a writ of habeas corpus may also be granted if the state court's decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). The district court relied on this provision as an alternative basis for granting habeas relief to Rubin. *See Rubin*, 128 F. Supp. 2d at 869-70. Because we conclude that the state court's decision was an unreasonable application of federal law under § 2254(d)(1), this ends our inquiry. There is no need to call the state court's factual findings into question.

6

cation of clearly established federal law "if the state court identifies the correct governing legal rule from [the] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case." *Id.* at 407. "Stated simply, a federal habeas court making the `unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable." *Id.* at 409.

The Court has stressed that "an unreasonable application of federal law is different from an incorrect application of federal law." *Id.* at 410. A federal court may not grant habeas relief "simply because [the] court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411; *see also Bell v. Jarvis*, 236 F.3d 149, 160-63 (4th Cir. 2000) (en banc). We must determine here whether the state court's legal conclusion that Rubin received effective assistance of counsel was an objectively unreasonable application of clearly established federal law to the facts of Rubin's case. *See Sullivan*, 446 U.S. at 341-42 (conflict of interest determination is a mixed question of law and fact, requiring the "application of legal principles to the historical facts").

### B.

It is clearly established federal law that the Sixth Amendment "right to counsel is the right to the effective assistance of counsel." *Strickland v. Washington*, 466 U.S. 668, 686 (1984) (internal quotations omitted). Further, it is clearly established that the right to effective assistance includes the right to representation free from conflicts of interest. *Sullivan*, 446 U.S. at 348-50; *see also Wood v. Georgia*, 450 U.S. 261, 271 (1981); *Holloway v. Arkansas*, 435 U.S. 475, 489-90 (1978); *Glasser v. United States*, 315 U.S. 60, 70, 76 (1942). Lawyers owe their clients a duty of loyalty, including the duty to avoid conflicts of interest. And the Supreme Court has emphasized that the duty of loyalty is "perhaps the most basic of counsel's duties." *Strickland*, 466 U.S. at 692.

In order to establish ineffective assistance of counsel in a conflict of interest situation, a defendant who did not raise an objection at trial "must demonstrate that an actual conflict of interest adversely

7

affected his lawyer's performance." *Sullivan*, 446 U.S. at 348. Adverse effect cannot be presumed from the mere existence of a conflict of interest. *See Mickens v. Taylor*, No. 00-9285, 2002 WL 459251, at *5-6 (U.S. Mar. 27, 2002). The Supreme Court has explained that *Sullivan* does not require "inquiry into actual conflict as something separate and apart from adverse effect." *Id.* at *5 n.5. Rather, "[a]n `actual conflict,' for Sixth Amendment purposes, is a conflict of interest that adversely affects counsel's performance." *Id.*

However, if a defendant shows that a conflict of interest existed and that it adversely affected counsel's performance, prejudice will be presumed and the defendant need not demonstrate a reasonable probability that, but for the attorney's conflict of interest, the trial's outcome would have been different. *Sullivan*, 446 U.S. at 349-50; *see also Mickens*, 2002 WL 459251, at *6; *Glasser*, 315 U.S. at 76. This presumption of prejudice arises because "it is difficult to measure the precise effect on the defense" when representation is "corrupted by conflicting interests." *Strickland*, 466 U.S. at 692; *see also Holloway*, 435 U.S. at 490-91. When lawyers' conflicts of interest adversely affect their performance, it calls into question the reliability of the proceeding and represents a breakdown in the adversarial process fundamental to our system of justice.

### III.

In Rubin's case, the Maryland Court of Special Appeals identified *Cuyler v. Sullivan* as the clearly established federal law governing Rubin's claim of ineffective assistance of counsel due to a conflict of interest. The state court also recognized that a conflict of interest can exist between a client and her attorneys' own personal interests and that both pretrial and trial representation can be ineffective. *See, e.g.*, *United States v. Magini*, 973 F.2d 261, 263-64 (4th Cir. 1992); *United States v. Tatum*, 943 F.2d 370, 376 (4th Cir. 1991).[2] However, the

_____

[2] While the Supreme Court has expressed doubt about whether *Sullivan* applies to every potential conflict of interest, *see Mickens*, 2002 WL 459251, at *7, the Court has never indicated that *Sullivan* would not apply to a conflict as severe as the one presented here. Therefore, we conclude that the state court correctly utilized the *Sullivan* framework when analyzing Rubin's ineffective assistance of counsel claim.

8

court did not conclude that Longest and Gavin's actions following the homicide created an actual conflict of interest that deprived Rubin of effective assistance. And the court did not consider the continuing effects of Longest and Gavin's conflict when evaluating the effectiveness of Rubin's trial representation.

This was an "objectively unreasonable" application of clearly established federal law because Longest and Gavin plainly had a conflict of interest that adversely affected their own performance and the performance of Rubin's trial counsel. Therefore, under *Sullivan*, Rubin was denied the effective assistance of counsel by Longest and Gavin's actual conflict of interest. Indeed, statutory terms of art fail to fully capture the appalling nature of the attorneys' misconduct here and the effect it had on Rubin's subsequent trial. What transpired requires us to take the rare and extraordinary step of granting Rubin the writ of habeas corpus under the rigorous standards of § 2254.

### A.

Longest and Gavin's personal interests fundamentally conflicted with the objectives of Rubin's representation from the moment they arrived at the scene of the crime until the completion of her trial. The state post-conviction court made numerous factual findings regarding Longest and Gavin's actions on the night of the homicide that gave rise to their conflict of interest. And, as the district court correctly emphasized, the Court of Special Appeals "left wholly intact" these findings of the post-conviction court. *Rubin*, 128 F. Supp. 2d at 865. In fact, the state court did not focus on or dispute the fact that Longest and Gavin had a conflict of interest. And nothing in the record suggests that Rubin waived or even understood the conflict of interest that Longest and Gavin's representation had created. *See Rubin*, 128 F. Supp. 2d at 866-67.

The Court of Special Appeals found that after arriving at the scene of the crime, "Longest told Miller and Leopold to take [Rubin] to a hospital for a possible drug overdose and have her admitted under a false name." The private investigators carefully followed Longest's instructions. Rubin left the crime scene and Miller and Leopold registered her under the alias of "Sharon Peterson" at the hospital. Then, "Longest notified the police that Warner was dead, but did not dis-

9

close [Rubin's] identity" and did not even notify the police that he and Gavin represented Rubin.

In addition, Longest and Gavin removed evidence from the crime scene. The state court found that "Longest took possession" of Rubin's property, including her "jacket, a purse,.22 caliber bullets and a .38 caliber Smith and Wesson handgun." Longest and Gavin kept these items at their own law offices. On the day following the homicide, Longest and Gavin failed to present Rubin to the police. Instead, concerned solely with their own financial gain, "Gavin drove [Rubin] to her bank to withdraw $105,000 to be used as [Longest and Gavin's] retainer fee and to cover [their] expenses." Finally, only after they discovered that a warrant was out for Rubin's arrest, Longest and Gavin turned Rubin in to the police almost twenty-four hours after they had arrived on the scene of the crime.

It can hardly be disputed that Longest and Gavin's conduct created a conflict of interest. Rubin's lawyers utterly failed to function as Rubin's advocates. Instead, they schooled Rubin, Miller, and Leopold in evasive action and functioned almost as accessories after the fact. The lawyers' desire to secure a $105,000 retainer fee "caused them to counsel Rubin to act in an unnecessarily suspicious fashion when they caused her to delay her surrender to the police for 24 hours." *Rubin*, 128 F. Supp. 2d at 865-66. Her attorneys' pretrial conduct created serious problems for Rubin at trial. Rubin's lawyers had instructed her to take the precise actions that were subsequently used by the prosecution at trial to establish her premeditation and consciousness of guilt. For example, the prosecutor seized on Rubin's conduct during closing argument, saying, *inter alia*: "Does she flee from this scene? You bet. Does she lie? You bet." *Rubin*, 128 F. Supp. 2d at 852.

Rubin thus had a strong interest in having Longest and Gavin help the jury understand that she acted on the advice of her own lawyers following the homicide. The very attorneys who were supposed to function in a representative capacity had become critical fact witnesses regarding the crime scene and Rubin's conduct. Testimony from either of the attorneys at trial might have helped explain Rubin's behavior to the jury.

10

Testimony, however, was apparently the last thing Longest and Gavin had in mind. They had a powerful conflicting interest in shielding themselves from testifying to conceal their role in the events following the homicide. Longest and Gavin did not — indeed could not — fulfill their obligations to vigorously protect their client's interests.

The state post-conviction court made undisputed findings that Longest and Gavin's actions had exposed them to potential criminal charges for obstruction of justice and hindering the apprehension of a criminal defendant. In fact, Longest and Gavin were the subject of a grand jury investigation that began before Rubin's trial and continued until after it was complete. Longest even had to engage his own attorney to represent him in this investigation. *See Rubin*, 128 F. Supp. 2d at 859-61, 865 (recounting Longest's post-conviction testimony and his attorney's testimony regarding the criminal investigation of Longest and Gavin). Furthermore, Longest and Gavin were also the targets of an inquiry by the Maryland Attorney Grievance Commission during which they had to justify the $150,000 fee they eventually collected for representing Rubin. *See id.* at 856-58 (recounting details from the post-conviction hearing involving Longest and Gavin's letter to the grievance commission justifying their fee). The Court of Special Appeals did not dispute these facts. And, in its reply brief, the State acknowledged the investigations of Longest and Gavin and conceded that Longest and Gavin's activities on the night of the homicide and the next day "were fraught with both ethical and criminal overtones." At all times, the attorneys' fidelity to their own interests superseded any sense of obligation they may have had to their client.

### B.

Instead of disputing that Longest and Gavin had a conflict of interest, the Court of Special Appeals concluded that any conflict Longest and Gavin had did not adversely affect Rubin's representation because Longest and Gavin advised Rubin to retain three independent attorneys to represent her at trial. In order to show an adverse effect from an attorney's conflict of interest, the defendant must establish by a preponderance of the evidence that a plausible alternative defense strategy existed "that [her] defense counsel might have pursued," that this "alternative strategy or tactic was objectively reasonable under

11

the facts of the case known to the attorney at the time of the attorney's tactical decision," and that "the defense counsel's failure to pursue that strategy or tactic was linked to the actual conflict." *Mickens v. Taylor*, 240 F.3d 348, 361 (4th Cir. 2001) (en banc), *aff'd*, 2002 WL 459251.

In its decision, the state court found that Longest and Gavin did not control Rubin's trial strategy and held "as a matter of law that, unless counsel could have prevented the happening of the [allegedly] deficient act, he or she cannot have rendered ineffective assistance." The court concluded that because Longest and Gavin did not have the right to insist on testifying, "their failure or refusal to do so did not constitute ineffective assistance of counsel." This was an objectively unreasonable application of *Sullivan* because Longest and Gavin's conflict of interest adversely affected Rubin's representation in at least two ways.

1.

First, Longest and Gavin's direct representation of Rubin was adversely affected by their conflict of interest. While the state court found that Longest and Gavin "were not responsible for deciding upon or for carrying out Mrs. Rubin's trial strategy," it also found that Longest and Gavin continued to serve "as counsel on behalf of Mrs. Rubin" from the night of the homicide until the end of her trial. They participated on her defense team. In the letter they sent to the Maryland Attorney Grievance Commission, Longest and Gavin indicated that they spent "by far" the most time with Rubin in the events leading up to her trial. *Rubin*, 128 F. Supp. 2d at 856. And at the end of the day, Longest and Gavin collected $150,000 for their representation of Rubin while Helfand, Goldstein, and Joseph collected only $100,000. *Id.* at 866.

Longest and Gavin's continued participation on Rubin's case, even after Helfand, Goldstein, and Joseph were brought in to serve as trial counsel, allowed them to wrap themselves in the attorney-client privilege and assure that they would not be asked to testify at trial. The defense team called Rubin to the stand as their sole witness, but never mentioned the role her attorneys played in directing her behavior following the homicide. This "virtually sealed off access to any testi-

12

mony from [Longest and Gavin]" regarding their role. *Rubin*, 128 F. Supp. 2d at 866. It allowed the prosecution to cross-examine Rubin about her conduct. And the State used those facts to establish Rubin's premeditation and her consciousness of guilt.

The only issues at Rubin's trial were premeditation and deliberation, not whether Rubin committed the homicide. The actions Longest and Gavin instructed Rubin to take made the shooting "look more premeditated and more deliberate." *Rubin*, 128 F. Supp. 2d at 869. Yet Longest and Gavin never considered "remov[ing] themselves from the case altogether so that they might become witnesses on her behalf. They never thought to draw the State's attention to their own actions regarding the handling of evidence at the crime scene or in causing the 24 hour delay in Rubin's surrender." *Id.*

The Supreme Court has observed that a conflict of interest has detrimental effects on representation "because of what it tends to prevent the attorney from doing." *Holloway*, 435 U.S. at 489-90. An adverse effect can be shown from an attorney's "failure to take actions that are clearly suggested from the circumstances." *Tatum*, 943 F.2d at 376. Here, the circumstances suggested that Rubin might have been helped by Longest and Gavin testifying. Rubin has shown that this was a plausible alternative defense strategy which was reasonable under the facts of the case and that the failure to pursue this strategy was linked to Longest and Gavin's conflict of interest. We agree with the district court that "[b]y failing to draw the spotlight on their own actions, whether for financial reasons (to remain in the case and gain a substantial fee) or out of fear for their own criminal liability, [Longest and Gavin] lapsed in their duty of representation." *Rubin*, 128 F. Supp. 2d at 869.

### 2.

Second, Longest and Gavin's conflict of interest ultimately tainted and adversely affected Rubin's representation by her three trial attorneys. Longest and Gavin violated the most basic principles of the attorney-client compact from the beginning to the end of Rubin's representation. The taint from their conflict of interest could not be cleansed simply by bringing in independent counsel to make trial decisions while Longest and Gavin continued to function as members

13

of the defense team. The Court of Special Appeals' conclusion that attorneys as conflicted as Longest and Gavin could somehow remain active in Rubin's case as long as they did not control trial strategy was an objectively unreasonable application of the *Sullivan* standard.

We do not call into question the state court's factual finding that Rubin's trial lawyers made the decision to not call Longest and Gavin as witnesses. However, the alternative decision was effectively unavailable to them. To discharge Longest and Gavin from the defense team and call them as witnesses, Helfand, Goldstein, and Joseph would have had to oust fellow members of the bar who had been the ones to recommend their services in the first place. They could hardly consider the benefits of calling Longest and Gavin as fact witnesses while Longest and Gavin were still functioning as Rubin's attorneys. This adversely affected Rubin's representation.

This court, applying *Sullivan*, has previously held that a conflicted attorney can taint trial counsel and render trial counsel's performance ineffective. In *Tatum* — a case that amazingly involved the very same David Gavin whose conduct is at issue in this case — this court concluded that bringing in independent trial counsel does not necessarily cleanse a serious conflict of interest if the conflicted attorney continues as a member of the defense team. *Tatum*, 943 F.2d at 378-79.[3]

"The present case replays *Tatum* almost exactly." *Rubin*, 128 F. Supp. 2d at 869. *Tatum* suggests that it is almost Longest and Gavin's modus operandi to represent people in a questionable capacity pretrial and then remain as a shadow team at trial after bringing trial counsel "up to speed." *See Rubin*, 128 F. Supp. 2d at 868. As in Rubin's case, Gavin was a potential fact witness for Tatum because Gavin's firm had apparently advised Tatum to do what he was being prosecuted for. *Tatum*, 943 F.2d at 373-74, 376-77. Instead of withdrawing from the case, Gavin continued to represent Tatum, thus attempting to deflect attention from his own actions and his firm's behavior. *Id.* at 377, 379. The State argued, just as it does in Rubin's case, that there was no ineffective assistance of counsel because Gavin did not represent Tatum at trial. *Id.* at 377-78. This court rejected that argument,

_____

[3] Of course, in keeping with the requirements of *Bell v. Jarvis*, 236 F.3d at 162, the case on which this court has plainly relied is *Cuyler v. Sullivan*. The use of *Tatum* is purely illustrative.

14

finding that it would never occur to Tatum's trial counsel to call Gavin as a witness with Gavin continuing to serve as co-counsel. Even though Gavin and Tatum's trial counsel made contributions to Tatum's defense that "varied in function and degree," the "joint effort by the two, when one was so completely disqualified, caused an unwitting, but disqualifying, taint to the other." *Id.* at 378. Just as in *Tatum*, Rubin's trial counsel's performance was tainted by the fact that Longest and Gavin continued to participate as members of the defense team.

### C.

The adverse effect Longest and Gavin's conflict of interest had on their own representation of Rubin and the taint the conflict had on Rubin's trial counsel establishes ineffective assistance of counsel under *Sullivan*. The State argues that Helfand, Goldstein, and Joseph's strategic decision to not call Longest and Gavin to the stand was reasonable and did not prejudice Rubin. The State asserts that Longest and Gavin's testimony might actually have harmed Rubin's defense by, *inter alia*, allowing the prosecution to delve into the attempted poisoning of Rubin's former lover, Glisson, and into the fact that Rubin had sought immunity in association with that poisoning.

These arguments are unavailing. With the conflict of interest established and the adverse effect on her representation shown, Rubin has carried her burden under *Sullivan*. 446 U.S. at 349-50. Longest and Gavin's representation of Rubin was more than ineffective — it was a perversion of the attorney-client relationship. Longest and Gavin's conflict of interest was so severe that it led to a corruption of the adversarial process that our system relies on to produce just results. It is hard to imagine a case that would call the fundamental fairness of a trial into more question than this one. What happened here should never happen in our system. Rubin is entitled to a new trial with conflict-free representation.

### IV.

For the foregoing reasons, we affirm the judgment of the district court and grant Rubin's petition for a writ of habeas corpus on the same terms ordered by the district court.

*AFFIRMED*

15

DIANA GRIBBON MOTZ, Circuit Judge, dissenting:

Today this court grants a writ of habeas corpus to Lisa Joyce Rubin, who, it concedes, unquestionably "shot and killed her husband," and whom a Maryland jury convicted of first-degree murder. The court grants habeas relief to Rubin (an honors college graduate) on the theory that she received ineffective assistance of counsel at her trial. Yet for six months prior to that trial, a team of three lawyers specializing in criminal law planned her defense and formulated trial strategy; this team represented Rubin at trial, examining witnesses, making objections, and asserting legal arguments on her behalf. The majority does *not* fault the skill or ethics of these three lawyers, whom the state court described as "highly qualified and experienced criminal defense counsel." Rather, the majority grants habeas relief because of a conflict of interest of two *other* attorneys, who advised Rubin in the hours and days immediately after she killed her husband. Although the two conflicted lawyers continued to meet with Rubin, they did not try her case, direct trial strategy, sit at counsel table, or even enter an appearance on her behalf in the trial court. The Supreme Court has never established — let alone clearly established — that a conflict of interest violates the Sixth Amendment under these circumstances.

This is not to say that the two conflicted lawyers — David Gavin and Darryl Longest — acted properly. They did not. Driven by their own financial interests rather than their client's interests, they certainly violated the ethical codes that govern all lawyers, and they may have committed crimes. I join in the majority's reprobation of their conduct. Indeed, were I left to my own devices to determine when a conflict of interest yields constitutionally ineffective assistance of counsel, I might endorse the conclusion that the existence of case-related contact between the conflicted and the unconflicted lawyers tainted the latter. But we are not free to do that. Instead, we must apply controlling law, including the deferential standard of review in the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), 28 U.S.C.A. § 2254(d)(1) (West Supp. 2001), which requires us to deny habeas relief unless we find a state court's decision is "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court." In this case, I can-

not so find. Accordingly, I must respectfully dissent from the majority's contrary holding.

## I.

The sole Supreme Court case cited as "the clearly established Federal law" authorizing habeas relief here is *Cuyler v. Sullivan*, 446 U.S. 335 (1980). *See ante* at 8-9 and 14 n.3. That case dealt with a conflict of interest involving dual representation — the same two attorneys represented three co-defendants, with conflicting interests, at three separate criminal trials. *Id.* at 337-40, 345-49. *Sullivan* provides no direct support for a finding of unconstitutional conflict of interest on the very different facts at issue here. Indeed, to the extent *Sullivan* has any specific relevance to this case, it suggests no conflict exists here. *See infra* n.5. Under circuit precedent, however, *Sullivan* does establish the relevant standard for assessing conflict of interest claims like the one at issue here. *See United States v. Tatum*, 943 F.2d 370, 375-76 (4th Cir. 1991); *but see Beets v. Scott*, 65 F.3d 1258, 1272 (5th Cir. 1995) (en banc) (holding that the standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), rather than *Sullivan*'s "more rigid rule," applies to "attorney breaches of loyalty outside the multiple [or successive] representation context"). *Sullivan* requires that "a defendant who raised no objection at trial [like Rubin] must demonstrate that [1] an actual conflict [2] adversely affected his lawyer's performance." 446 U.S. at 348. The majority iterates and reiterates Gavin and Longest's actual conflict, but offers only two reasons why this conflict "adversely affected Rubin's representation." *Ante* at 12. Neither is at all persuasive.

### A.

First, the majority contends that "Longest and Gavin's *direct representation* of Rubin was adversely affected by their conflict of interest." *Id.* (emphasis added). Specifically, the majority agrees with the district court that Longest and Gavin should have testified at Rubin's trial to "draw the spotlight on their own actions." *Rubin v. Gee*, 128 F. Supp. 2d 848, 869 (D. Md. 2001).

To demonstrate "adverse effect," however, a defendant must not only "identify a plausible alternative defense strategy his defense

17

counsel might have pursued," but also must: (i) show that this strategy was "objectively reasonable," i.e., "clearly suggested by the circumstances," "under the facts of the case known to the attorney at the time of the attorney's tactical decision," *and* (ii) establish a link between the conflict and the failure to pursue the strategy. *Mickens v. Taylor*, 240 F.3d 348, 361 (4th Cir. 2001) (en banc) (citation omitted), *aff'd*, ___ U.S. ___, 122 S. Ct. 1237 (2002). The majority utterly fails to demonstrate that the proffered alternative defense strategy — calling Longest and Gavin to testify — was "objectively reasonable" or not "pursue[d]" because of Longest and Gavin's conflict. *Id.* Thus, even if we were free to ignore the stringent standard of review mandated by AEDPA and to ask simply whether the decision not to call Longest and Gavin had an adverse effect on Rubin's representation, Rubin could not prevail on this claim. Taking account of the limitation AEDPA places on our review, there is no way to conclude that the state court's contrary determination was unreasonable.

Testimony from Longest and Gavin simply would not have helped Rubin and, therefore, offering this testimony at trial would not have been "objectively reasonable." *Id.* At the state post-conviction hearing, Rubin's two surviving trial lawyers (one had died before the post-conviction proceeding occurred) recounted their struggles to formulate a defense theory around Rubin's shifting and incomplete account of the night she shot her husband. They explained, at length, the multiple problems with introducing testimony by Longest and Gavin, as well as the incompatibility between such testimony and their trial strategy. Their explanation establishes beyond doubt that calling Longest and Gavin, though superficially plausible, was not an "objectively reasonable" strategy that was "clearly suggested by the circumstances." *Id.* (citation omitted).

First, testimony from Longest and Gavin, who knew a great deal about Rubin's activities and statements after the killing and at other times, would have opened the door to much damaging evidence. After Rubin shot her husband, she first telephoned Robert Miller, a private detective with whom she had a "personal relationship" including late night dinners, assistance in finding a new home, and personal confidences. *See Rubin v. State*, 602 A.2d 677, 679 (Md. 1992); *Rubin v. Gee*, 128 F. Supp. 2d at 852 (quoting closing argument). Miller arrived at the scene with his assistant, another private detective named

18

Robert Leopold, viewed the body, and telephoned Longest. Not until an hour after the detectives' arrival did Longest and Gavin arrive at the scene.

If Longest and Gavin had testified, the jury would have heard that right after Rubin repeatedly shot her husband, reloaded, fired five additional bullets into his back as he lay face down, and reloaded again — all supposedly in a frenzy of terror — she developed the presence of mind to stay in the vicinity for an extended period to consult at length with her private detectives and lawyers. The jury would have heard details including the three hours Rubin spent at the scene without calling an ambulance. With this fodder, the prosecutor could have extensively elaborated on his brief comments on the point that the first person Rubin called was *not* a lawyer but Robert Miller, her intimate.[1] We can ascertain this much even from the minimal information that Longest and Gavin have disclosed to date. *See Rubin v. State*, 602 A.2d at 682-84; Answer to Petition for Habeas Corpus, Ex. 2 at 96 et seq. (containing the scant post-conviction testimony by Longest concerning the events of the night of the killing and no testimony by Gavin).

In addition, a substantial portion of the night's activities has never emerged, because Rubin did successfully assert the privilege with respect to Longest and Gavin, and with respect to her communications with Miller and Leopold after Longest and Gavin arrived at the scene of the shooting. We cannot know what other damaging statements or observations, made after the privilege arose, Longest and Gavin (and Miller, Rubin's intimate) would have had to relate, if Rubin had waived the privilege. We do know that without sacrificing the privilege as defined by the trial court,[2] or otherwise harming Lon-

_____

[1] The state courts never fully resolved the question whether Longest or Miller gave the instruction to use an alias in checking Rubin into the hospital. Direction by Miller, Rubin's intimate who was not a lawyer, *see Rubin v. State*, 602 A.2d at 679, would obviously not have resonated to her benefit.

[2] Over defense objections, the trial court ruled that the attorney-client privilege arose not when Rubin's private detectives, Miller and Leopold, arrived at the crime scene, but only later, when her attorneys, Longest and Gavin, arrived. *See Rubin v. State*, 602 A.2d at 683-84 (describing and affirming this ruling).

19

gest or Gavin's interests in the slightest, the defense could have called Rubin's private detective (and good friend), Miller, to describe his several lengthy one-on-one conversations with Rubin at the scene before Longest and Gavin arrived. *See* Answer to Petition, Ex. 2 at 173, Ex. 4 at 54-57, 70. If the defense had believed such testimony about Rubin's behavior or conversation soon after the killing would have assisted her, Miller, an obviously friendly witness, was certainly available to testify. Yet the defense chose not to open that door, in a decision that no one does, or could, attribute to a desire to protect Longest and Gavin.

To be sure, the prosecution made good use of the missing pieces in Rubin's account, pointing out that she had left the scene of the shooting and had checked herself into the hospital under a false name; and if Longest and Gavin had testified the jury would probably have heard that they told Rubin to leave and use an alias. *But see supra* n.1. But the same prosecutor who used the missing pieces in Rubin's story to the State's advantage could certainly have made hay out of Longest and Gavin's more detailed account of Rubin's behavior — amplified by whatever additional facts a waiver of privilege might have revealed through testimony by Longest, Gavin, or Miller.

Moreover, even if calling Longest and Gavin had been a more attractive option, the decision not to call them was part of the broader defense strategy aimed at allowing Rubin to escape conviction altogether. Rubin's team of trial lawyers explained that they focused on asserting attorney-client privilege as a way to exclude the testimony of her other private detective, Robert Leopold, which, they believed, was so uniquely damaging to Rubin that if it could be excluded as privileged, Rubin would walk free.[3] Of course, as it turned out, the trial court permitted Leopold to testify, and on appeal this was held to be only harmless error. *See Rubin v. State*, 602 A.2d at 684-90. But at the time, trial counsel hoped to exclude Leopold's observations, leaving a far greater area of doubt as to events surrounding the shooting.

_____

[3] Leopold was the only witness who testified that Rubin's purse contained bullets fitting the gun she said her husband had brought to the scene.

20

Trial counsel's lucid explanations, both of the trial strategy they followed and of the danger to Rubin in the strategy she now suggests, clearly show why testimony by Longest and Gavin was not an "objectively reasonable" alternative strategy that the circumstances at trial "clearly suggested." *Mickens*, 240 F.3d at 361. In sum, the pitfalls involved in Longest and Gavin's testimony about the night of the killing and the possibility of excluding Leopold's testimony and leaving massive gaps in the State's case demonstrate that under any standard, Rubin has not shown that the decision not to call Longest and Gavin had an adverse effect on her defense.[4]

Applying the stringent AEDPA standard of review, as we must, renders this conclusion inescapable. On habeas review we may only reverse the state post-conviction court if its determination was "contrary to, or involved an unreasonable application of" clearly established federal law. 28 U.S.C.A. § 2254(d)(1). In this case, the state post-conviction appellate court concluded that "it is understandable why [Longest and Gavin] were never called to the stand by the defense team." Considering the perils on the road not taken, I can only agree. In any event, the state post-conviction court's conclusion

_____

[4] The district court also held that Longest and Gavin denied Rubin effective counsel during the pretrial phase. *See Rubin v. Gee*, 128 F. Supp. 2d at 865-68. However, the court pointed to no specific adverse effect of Longest and Gavin's out-of-court activities after trial counsel entered the case, *see id.* at 866-67, and it is difficult to see how their presumed desire to avoid testifying could have affected trial preparation, given the very limited out-of-court work that even the district court attributed to them. *Id.* at 867. I note that a grand jury indicted Rubin, so her initial waiver of indictment had no effect whatsoever on her trial. Nor is it plausible that prosecutorial focus on Longest and Gavin before trial would have diverted the prosecutors' attention from Rubin. The prosecutors were investigating Longest and Gavin well prior to Rubin's trial, *see ante* at 11, making it clear to Rubin's three other, non-conflicted lawyers that they had the option of throwing Longest and Gavin to the wolves. Moreover, in view of the fact that Rubin alone shot her husband, the prosecutors were hardly likely to immunize her or allow her to plead to an equivocal account of the killing in order to pursue her counsel for obstruction of justice. Perhaps for these reasons, the majority tellingly does *not* hold that Longest and Gavin denied Rubin effective counsel during the pretrial phase.

21

that Rubin suffered no adverse effect from the decision not to call Longest and Gavin — that calling them was not an "objectively reasonable" strategy that was "clearly suggested by the circumstances" — was certainly not itself objectively unreasonable.

Finally, and most basically, the majority's contention — that "Longest and Gavin's direct representation of Rubin was adversely affected by their conflict of interest" because they determined they would not testify at trial — rests on a false premise. *Ante* at 12-13. In fact, Longest and Gavin *did not determine* that they would not testify. Rather, as the state court expressly held, the "choice to offer [their] testimony was neither Longest's or Gavin's to make." Instead, like all "trial strategy" decisions, the state court held that the decision as to whether Longest and Gavin would testify was made by the three "outstanding attorneys," *Rubin v. Gee*, 128 F. Supp. 2d at 862, who represented Rubin at trial. The majority expressly states that it does "not call into question the state court's factual finding that Rubin's trial lawyers made the decision to not call Longest and Gavin as witnesses." *Ante* at 14. Given this state-court finding, Rubin has not established and cannot establish the necessary "link[ ]" between Longest and Gavin's "actual conflict" and the decision she challenges. *See Mickens*, 240 F.3d at 361.

Therefore, the majority's first reason for concluding that Longest and Gavin's conflict of interest "adversely affected Rubin's representation," *ante* at 12, unquestionably fails.

### B.

The majority's only other rationale for concluding that Longest and Gavin's conflict of interest adversely affected Rubin's representation is that this conflict assertedly tainted Rubin's three trial counsel, Barry Helfand, Alan Goldstein, and Fred Joseph. The majority does not suggest that any member of the three-man trial team, himself, had any conflict of interest with Rubin. Nevertheless, the majority concludes that the conflict of interest of non-trial counsel (Longest and Gavin) infected the trial team. Maybe so, but the Supreme Court has never endorsed such a theory.[5]

_____

[5] Indeed, in *Sullivan* the Court specifically noted that both conflicted lawyers "played *important roles* at all three [defendants'] trials," as a

22

In holding to the contrary, the majority heavily relies on our precedent, *United States v. Tatum*, 943 F.2d at 373-79. Recently, however, the Second Circuit reached the opposite conclusion, finding that "because [a conflicted lawyer] had no input into trial strategy, his participation [at trial] does not require *per se* reversal." *Triana v. United States*, 205 F.3d 36, 42 (2d Cir. 2000). *But see Tatum*, 943 F.3d at 378 ("From the necessary conclusions that [the conflicted lawyer] was an acknowledged source of information to [the non-conflicted lawyer] and [the latter] . . . felt the need to have [the conflicted lawyer] present throughout the trial, we conclude that the presentation of [the] defense was the product of both . . ., even though their contributions may have varied in function and degree.").

Although I certainly prefer our approach, in light of the Supreme Court's silence on the point, it is impossible to conclude that it was "clearly established," as a matter of *Supreme Court* law, that our rule must be followed. *See* 28 U.S.C.A. § 2254(d)(1); *Williams v. Taylor*, 529 U.S. 362, 412 (2000). Indeed, the circuit split exhibited by *Triana* and *Tatum* testifies to the absence of any Supreme Court case that resolves the question. Nor can I conclude that the state court's application of *Sullivan*, echoing that of the Second Circuit in *Triana*, was objectively unreasonable.

Even if we could rely on our circuit precedent (ignoring well-reasoned contrary precedent of a sister circuit) as indicative of "Federal law, as clearly established by the Supreme Court" or as limiting objectively reasonable applications of that law, numerous distinctions between Rubin's case and *Tatum* prevent reliance on *Tatum* here.

_____

predicate for its holding that the defendant had proved an actual conflict of interest. *See Sullivan*, 446 U.S. at 342 (emphasis added). Although for clarity's sake, I follow the majority's lead in treating taint as an "adverse effect" question, the context of the *Sullivan* Court's comment suggests that actually it may be more properly analyzed as a question of whether an "actual conflict" exists. *See also Beets*, 65 F.3d at 1277-78. Viewed that way, I would conclude, for the reasons set forth in text, that no "clearly established Federal law as determined by the Supreme Court," 28 U.S.C.A. § 2254(d), holds that counsel in the position of Rubin's three-man trial team had an actual conflict of interest.

23

Given these factual and legal distinctions, it is doubly difficult to see how the state appellate post-conviction court's conclusion, that Longest and Gavin's conflict did not render the assistance of Rubin's three trial counsel constitutionally ineffective, was an objectively unreasonable application of federal law as established by the Supreme Court.

First, the nature of Longest and Gavin's work for Rubin dramatically differed from that of the conflicted lawyers in *Tatum* (and *Triana*) for their clients. The taint we considered in *Tatum* — from a conflicted lawyer who appeared at trial, "helping" trial counsel "throughout the presentation for this trial" to "bring [trial counsel] up to speed" — is simply not implicated in Rubin's case. *Tatum*, 943 F.2d at 378; *see also Sullivan*, 446 U.S. at 342 (noting that the conflicted lawyers involved "played important roles at all three [defendants'] trials"). Rather, the surviving two members of the trial team have unequivocally testified — and the state post-conviction court has found — that they, *not* Longest and Gavin, made *all* the strategic trial decisions, in accord with their own views of "the best interest of Lisa Rubin," and that they made no decisions in order to protect Longest and Gavin.[6] As one of them testified, "[N]ever, at any time, was there any indication whatsoever that any discussion of strategy was based upon any relationship . . . [t]hat any of us had with anyone in the world other than [Rubin]." Consistent with this account, neither Longest nor Gavin planned the course of the trial, delivered an opening statement or closing argument, examined a witness, or took part in the

_____

[6] The state post-conviction court found that Longest and Gavin's *only* contribution after Rubin turned herself in was "`paralegal/investigative' work." The district court rejected this finding, *see Rubin v. Gee*, 128 F. Supp. 2d at 869-70, largely on the basis of Longest and Gavin's self-serving letter justifying their attorney fees. On examination, however, that letter simply shows that Longest and Gavin scurried around to keep Rubin happy and to retain the substantial fees she had paid them, not that they did more than "paralegal/investigative work." In any event, the majority (although discussing the letter at length) does *not* reject the state-court finding as to the limited paralegal nature of Longest and Gavin's work *or* the state-court finding that Longest and Gavin had no effect on trial strategy. *See ante* at 12-13, 14. Accordingly, we are bound by those findings. *See* 28 U.S.C.A. § 2254(d)(2), (e)(1). In light of them, the majority's taint discussion rests on a sandy foundation indeed.

24

trial in any way. Indeed, far from guiding and educating trial counsel in court as in *Tatum* or *Triana*, Longest and Gavin *never appeared at trial* or even *noted their appearances* in the trial court on behalf of their client.

Second, also unlike the conflicted lawyer in *Tatum*, who had allegedly recommended commission of the charged crime, Longest and Gavin gave relevant advice only *after* the crime had been committed. *Cf. Tatum*, 943 F.2d at 374 (noting that the conflicted attorney allegedly recommended the act in question, a bankruptcy fraud). Such advice, unlike that of the lawyer in *Tatum*, does not directly illuminate Rubin's intent at the time of the act. More broadly, Rubin's act — shooting her husband — differs greatly from the financial crime addressed in *Tatum*, in which advice of counsel might even have excused the entire act; in *Tatum* the defendant might have blamed the conflicted lawyer for recommending the very act that was the center of the trial. Factual testimony by Longest and Gavin could not have directly altered the law's treatment of the shooting itself.

Third, *Tatum*, unlike the case at hand, did not involve federal review of a state conviction. The claim of the defendant in *Tatum* therefore simply did not implicate the "significant interest[] in . . . federalism that underlie[s] the federal habeas scheme." *Evans v. Smith*, 220 F.3d 306, 321 (4th Cir. 2000). In contrast, when considering Rubin's claim, we must bear in mind the "important interest[] in . . . respect for state court judgments that underlie[s] the statutory habeas scheme." *Id.* at 323. Congress's enactment of the AEDPA, which occurred after we decided *Tatum*, further heightens the importance of these federalism concerns. To overturn the reasoned decision of a state court on the basis of our precedent, rationally disputed by another circuit and neither addressed nor confirmed by the Supreme Court, would erode the balance that both our federalist Constitution and the AEDPA are meant to protect.

In sum, given the relevant circuit split on facts that more obviously support a finding of ineffective assistance — that is, in cases where the conflicted lawyer appeared at trial and where the facts concerning the lawyer's role were more directly exculpatory — I cannot conclude that the state appellate post-conviction court unreasonably applied Supreme Court law by declining to rule that Longest and Gavin

25

tainted the effectiveness of Rubin's trial team. Indeed, scrupulous adherence to *Mickens*, 122 S. Ct. at 1245-46 (emphasizing the importance of actual representation of conflicting interests for the presumption of prejudice), would seem to compel denial of habeas relief in this case. For these reasons, the majority's only remaining rationale for finding adverse effect also clearly fails.

## II.

In the months between April 24, 1990, the night Lisa Rubin shot her husband, and November 11, 1990, the day she was convicted of his murder, she employed five lawyers. Although two of them, Longest and Gavin, served her poorly on the night of the killing, three other talented lawyers took over within days of the killing *and* prepared her case for over *six months* before trial. The state court specifically found that those three "highly qualified and experienced criminal defense counsel" alone fashioned Rubin's defense, and represented her at trial. Those three lawyers made the tactical decision to advise Rubin to assert privilege with respect to her conversations with Longest and Gavin. Those three lawyers reached this decision to avoid opening the door to everything Longest and Gavin knew about Rubin's tangled relationship with her husband and her incriminating behavior after she killed him. Neither the majority nor the district court suggests that any one of those three lawyers did not skillfully represent Rubin or had an interest conflicting with Rubin's.

The only conceivable reason anyone would think of faulting the performance of trial counsel is some kind of taint from the two conflicted lawyers who took no part in the trial. But the Supreme Court has *never* held that a non-participating lawyer's conflict could so infect otherwise unconflicted lawyers' representation as to render the latter's representation constitutionally ineffective. Even when a conflicted lawyer *appears at trial and handles trial work*, the circuits have divided as to whether a conflicted lawyer can taint the representation of other, otherwise unconflicted lawyers.

Against this legal and factual background, I cannot conclude that the state court's decision rejecting Rubin's ineffective-assistance claim was "contrary to, or involved an unreasonable application of,

26

clearly established Federal law, as determined by the Supreme Court."
28 U.S.C.A. § 2254(d)(1). I therefore respectfully dissent.

27