**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————

No. 10-2162

———————

UNITED STATES OF AMERICA

v.

JOHN J. HAMILTON, JR.,

Appellant

———————

On Appeal from the United States District Court
for the District of New Jersey
District Court  No. 2-05-cr-00876-001
District Judge: The Honorable Jose L. Linares

———————

Argued:  January 25, 2011

———————

Before: McKEE, *Chief Judge*, and SMITH, *Circuit Judges*,
and STEARNS, *District Judge**

(Filed:  February 3, 2011)

———————

OPINION

———————

_____

* The Honorable Richard G. Stearns, United States District Judge for the United States District Court of Massachusetts, sitting by designation.

Joshua L. Markowitz, Esq.
Michael J. O'Donnell, Esq. (Argued)
3131 Princeton Pike
Building 3D, Suite 200
Lawrenceville, NJ 08646

Counsel for Appellant

Mark E. Coyne, Esq.
Office of the United States Attorney
970 Broad Street, Room 700
Newark, NJ 07102

Glen J. Moramarco, Esq. (Argued)
Office of the United States Attorney
Camden Federal Building & Courthouse
401 Market Street
P.O. Box 2098, 4th Floor
Camden, NJ 08101

Counsel for Appellee

STEARNS, *District Judge.*

In 2001, John Hamilton served as a City Councilman and as the Deputy Mayor of Asbury Park, New Jersey. Hamilton held one of five votes on the City Council, which controlled the hiring of contractors to perform City services. Since the 1970s, Robert Steffer has worked with the F.B.I. as an undercover cooperating witness. In his dealings with Hamilton, Steffer held himself out to be a corrupt demolition contractor. In May of 2001, Hamilton accepted $2,000 in cash from Steffer and the free construction of a driveway at his home (allegedly worth $5,000). In exchange, Hamilton agreed to assist Steffer in obtaining City

demolition contracts. Vincent Baker, a friend of Hamilton's, served as Hamilton's bag man. Steffer recorded his meetings with Hamilton and Baker, in which they planned and executed the bribery scheme. On February 22, 2005, the F.B.I. arrested Hamilton.

On December 12, 2005, a grand jury sitting in Newark, New Jersey, issued a five-count indictment, naming Hamilton in four counts: conspiracy to extort benefits under color of official right in violation of 18 U.S.C. § 1951(a); attempt to extort benefits under color of official right in violation of 18 U.S.C. § 1951(a); acceptance of a thing of value to influence and reward in violation of 18 U.S.C. § 666(a)(1)(B); and making a false statement in violation of 18 U.S.C. § 1001. On November 6, 2006, the grand jury returned a superseding indictment adding an additional count of attempted witness tampering in violation of 18 U.S.C. § 1512(b)(3). The case was assigned to United States District Judge Jose L. Linares.

On September 12, 2007, Baker, who was also named in the indictment, pled guilty to Count Four.[1] On November 13, 2007, Hamilton's jury trial commenced. Judge Linares declared a mistrial on November 21, 2007, as the jury was unable to reach a verdict on any count. A retrial began on September 23, 2008. On October 8, 2008, the jury returned a verdict of guilty on all counts. Hamilton filed three

---

[1] Count Four charged Baker with money laundering, in violation of 18 U.S.C. § 1956(a)(3). The District Court sentenced Baker, who testified against Hamilton at trial, to a one-year term of probation.

post-verdict motions for a new trial; the District Court denied all three motions in a written opinion issued on March 18, 2010. On April 12, 2010, Judge Linares sentenced Hamilton to concurrent 41-month terms of imprisonment on each of the five counts.

Hamilton's appeal focuses primarily on the District Court's denial of the motions for a new trial. He alleges that his trial counsel labored under a conflict of interest, that the District Court gave an erroneous jury instruction regarding the $5,000 threshold of the bribery statute, 18 U.S.C. § 666, and that cumulative overreaching by the Government tainted the overall fairness of his trial. He also claims error in the District Court's four-level Guideline enhancement of his sentence based on his status as an elected public official.[2]

Hamilton's principal argument concerns his trial counsel's allegedly debilitating conflict of interest. Hamilton did not object at trial to a conflict of interest on the part of Michael Baldassare, his lead trial counsel, or the other

---

[2] The District Court had subject matter jurisdiction under 18 U.S.C. § 3231. This Court has jurisdiction over the challenges to the conviction pursuant to 28 U.S.C. § 1291, and over the challenges to the sentence pursuant to 18 U.S.C. § 3742(a). We review the denial of a motion for a new trial for an abuse of discretion. *United States v. Joseph*, 996 F.2d 36, 39 (3d Cir. 1993). We give plenary review to the District Court's legal conclusions, including those involving the interpretation of the advisory Sentencing Guidelines. *See United States v. Diaz*, 592 F.3d 467, 470 (3d Cir. 2010). We screen any attendant factual findings for clear error. *See United States v. Nolan-Cooper*, 155 F.3d 221, 229 (3d Cir. 1998).

lawyers from the firm of Gibbons, P.C., who assisted Baldassare in the defense.[3]

Under *Cuyler v. Sullivan*, 446 U.S. 335, 348 (1980), a defendant who raised no objection at trial must demonstrate an actual conflict of interest on his lawyer's part. An "actual" conflict of interest is a conflict that adversely affected counsel's performance at trial, "as opposed to a mere theoretical division of loyalties." *Mickens v. Taylor*, 535 U.S. 162, 171 (2002).

"[A]n actual conflict is more likely to occur in cases of joint representation – representation of more than one defendant at the same trial – rather than simply multiple representation – representation of defendants in different trials . . . ." *United States v. Morelli*, 169 F.3d 798, 810 (3d Cir. 1999). *Cf. Cuyler*, 446 U.S. at 346 (an "actual" conflict of interest will not be inferred from the mere fact of joint representation).

Although Asbury Partners was not a defendant in this or any other trial, Hamilton alleges that the coterminous representation by the Gibbons law firm of Asbury Partners, the "master developer" of the Asbury Park waterfront project,

---

[3] We do not imply any fault on Hamilton's part in this regard. We have no reason to doubt his explanation that he first became aware of the potential conflict upon reading a promotional brochure listing Asbury Partners as a client of the Gibbons firm well after the verdict in his second trial.

created such a conflict.[4]  Where, as here, the allegation is of a conflict resulting from multiple representation, Hamilton must show two elements.

> First, he must demonstrate that some plausible alternative defense strategy or tactic might have been pursued.  He need not show that the defense would necessarily have been successful had it been used, but that it possessed sufficient substance to be a viable alternative. Second, he must establish that the alternative defense was inherently in conflict with or not undertaken due to the attorney's other loyalties or interests.

*United States v. Gambino*, 864 F.2d 1064, 1070 (3d Cir. 1988) (quoting *United States v. Fahey*, 769 F.2d 829, 836 (1st Cir. 1985)).[5]  *See also McFarland v. Yukins*, 356 F.3d 688, 701 (6th Cir. 2004).

The essence of the argument, as we understand it, is that despite the winning contribution Hamilton could supposedly have made to his own defense, Baldassare did not call him to testify because of "the possibility that his testimony would have reflected negatively on Asbury Partners." Appellant's Br. at 22.  *See Boykin v.*

---

[4] It is not entirely clear from the record, but it appears that the corporate department of Gibbons, P.C., a 200-plus member Newark, New Jersey, law firm, represented Asbury Park in connection with the commercial development of one of the waterfront parcels.

[5] If a defendant makes the requisite showing, "prejudice will be presumed and the defendant need not demonstrate a reasonable probability that, but for the attorney's conflict of interest, the trial's outcome would have been different." *Rubin v. Gee*, 292 F.3d 396, 401-402 (4th Cir. 2002). *See United States v. Segarra-Rivera*, 473 F.3d 381, 385 n.2 (1st Cir. 2007) (distinguishing claims in which counsel is alleged to have performed incompetently, which require a showing of prejudice, from claims in which a defendant succeeds in showing that counsel labored under an "actual conflict of interest," which may trigger relief without a showing of prejudice).

*Webb*, 541 F.3d 638, 646 (6th Cir. 2008) ("[T]he failure to call witnesses beneficial to client A but detrimental to client B, coupled with the failure to cross-examine client B, is the very definition of a conflict of interest . . . ."). However, Hamilton offered no evidence to the District Court that Baldassare even knew that corporate lawyers in his large law firm were representing Asbury Partners in a commercial venture involving Asbury Park, or that he failed to pursue a viable alternative defense because of his firm's client relationship with Asbury Partners.[6] There was simply no error in the District Court's finding that Hamilton had failed to bear his burden of demonstrating the existence of an actual conflict of interest.

We turn next to Hamilton's claim that he should have been granted a new trial on Count Three (the bribery statute) because the Government had misled the jury as to how the $5,000 threshold requirement under 18 U.S.C. § 666 could be met. Under § 666, it is a crime when a person who is an agent of a state or local government or agency

> corruptly solicits or demands for the benefit of any person, or accepts or agrees to accept, anything of value from any person, intending to be influenced or rewarded in connection with any business, transaction, or series of transactions of such organization, government, or agency involving any thing of value of $5,000 or more.

---

[6] The more plausible explanation for the strong advice Hamilton was given not to testify was the damning impeachment material available to the government in the 2,000 secret tape recordings that Steffer had made during the unfolding of the illicit bargain.

18 U.S.C. § 666(a)(1)(B).

At Hamilton's trial, the District Court provided the following instruction to the jury regarding the $5,000 threshold.

> This $5,000 threshold can be reached by determining how much the business or transactions were worth to the local government, the payor or the public official who was soliciting, demanding, accepting or agreeing to accept the payment. For instance, if the value of the corrupt payment that the public official accepts is $5,000 or more, or if the value of the contract or matter at issue is worth $5,000 or more to the payor of the local government, then this is evidence that the value of the particular transaction or business at issue was worth $5,000 or more.

Appellee's Supp. App. at 460-461. In its opening and closing statements to the jury, the Government had urged an expansive view of the $5,000 jurisdictional threshold, suggesting that it could be satisfied either by the value of the bribes paid by Steffer to Hamilton, or by the value of the corrupt demolition contracts that Hamilton had attempted to procure on Steffer's behalf.

During the deliberations, the jury sought clarification of the instruction on the $5,000 threshold. At Hamilton's request, and over the Government's objection, the District Court instructed the jury that they could not rely simply on the amount of the bribe, but that they must *also* find the value of the anticipated business or transactions to be $5,000 or more. Because the District Court instructed the jury as Hamilton requested, and in a way more favorable to his cause than the one the Government urged, we are not inclined to entertain his challenge of the same

8

instruction on appeal.[7]  *Cf. United States v. Ozcelik*, 527 F.3d 88, 97 n.6 (3d Cir. 2008) ("Because Ozcelik made a joint request in favor of the very instructions he now challenges, he waived his right to raise these instructional issues on appeal under the invited error doctrine.").

We have examined the remaining grab bag of issues raised by Hamilton and find that none of them merit any extended comment.[8]

For the foregoing reasons, we will affirm the judgment of the District Court.

---

[7] To be clear, we find nothing erroneous in the instruction as given.

[8] Judge Linares found that Agent Russ's colorful description of the investigation in which Hamilton had become enmeshed sailed close to the wind, but short of the line the Judge had drawn.  The stray remark by Steffer regarding the fact that the Asbury Park City Manager (whose name had come up in the investigation) was "in prison now," was fully addressed by Judge Linares's forceful curative instruction.  We have read the prosecutor's closing argument and despite an unfortunate verbal tic (the repeated resort to the circumlocution "I think"), we see nothing in it that would amount to impermissible vouching. Any criticism over the lack of access to Baker's personal tax returns is laid solely at Hamilton's feet by virtue of his failure to take advantage of the permission he was given to subpoena them.  We perceive nothing in the nature of double counting in U.S.S.G. § 2C1.1(b)(3)'s four-level enhancement for elected officials or anything particularly unfair in applying the enhancement to Hamilton even though "he had not been elected to a high-level decision-making or sensitive position."  The argument that Count Three should have been set aside by Judge Linares because Hamilton could not have delivered on his corrupt promises confuses the doctrines of legal and factual impossibility, as counsel acknowledged at oral argument.  Finally, the suggestions that the Government extracted unfair advantage by not indicting its key witness (Steffer), or that it "manufactured" jurisdiction under the Hobbs Act by hiring a contractor that used heavy equipment manufactured out of state to pave the "gifted" driveway at Hamilton's home, call for no comment at all.